# SEARCH WARRANT

G.L. c. 276, §§ 1-7

TRIAL COURT OF MASSACHUSETTS

DISTRICT _____ COURT DEPARTMENT

EAST BOSTON _____ DIVISION

SEARCH WARRANT DOCKET NUMBER

03 SW 0072

**TO THE SHERIFFS OF OUR SEVERAL COUNTIES OR THEIR DEPUTIES, ANY STATE POLICE OFFICER, OR ANY CONSTABLE OR POLICE OFFICER OF ANY CITY OR TOWN, WITHIN OUR COMMONWEALTH:**

Proof by affidavit, which is hereby incorporated by reference, has been made this day and I find that there is **PROBABLE CAUSE** to believe that the property described below:

- [ ] has been stolen, embezzled, or obtained by false pretenses.
- [x] is intended for use or has been used as the means of committing a crime.
- [x] has been concealed to prevent a crime from being discovered.
- [x] is unlawfully possessed or concealed for an unlawful purpose.
- [x] is evidence of a crime or is evidence of criminal activity.
- [ ] other (specify) _____

**YOU ARE THEREFORE COMMANDED** within a reasonable time and in no event later than seven days from the issuance of this search warrant to search for the following property:

See ADDENDUM A attached hereto and incorporated herein.

- [x] at:

See ADDENDUM B attached hereto and incorporated herein.

which is occupied by and/or in the possession of: _____

- [x] on the person or in the possession of:

Gregory Tzannos DOB: 12-30-1946

You [x] are [ ] are not    also authorized to conduct the search at any time during the night.

You [ ] are [x] are not    also authorized to enter the premises without announcement.

You [x] are [ ] are not    also commanded to search any person present who may be found to have such property in his or her possession or under his or her control or to whom such property may have been delivered.

**YOU ARE FURTHER COMMANDED** if you find such property or any part thereof, to bring it, and when appropriate, the persons in whose possession it is found before the EAST BOSTON Division of the DISTRICT Court Department.

DATE ISSUED: AUGUST 28 2003

FIRST OR ADMINISTRATIVE JUSTICE
WITNESS: Hon Paul F. Mahoney Esq

SIGNATURE OF JUSTICE, CLERK-MAGISTRATE OR ASSISTANT CLERK
X _____

PRINTED NAME OF JUSTICE, CLERK-MAGISTRATE OR ASSISTANT CLERK
Hon Paul F. Mahoney Esq

0025

COMMONWEALTH OF MASSACHUSETTS

AFFIDAVIT
OF TROOPER PASQUALE F. RUSSOLILLO
IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT
(G.L.c.276,ss. 1 to 7; ST.1964, c.557)

I, Pasquale F. Russolillo, being duly sworn, depose and say:

A. I have been a law enforcement officer for the past 15 years. From June 1988 to June 1993, I was a Police Officer for the City of Nashua in New Hampshire. From June 1993 to the present, I have been a Massachusetts State Police Officer. Since September of 1997, I have been assigned to the Special Service Section of the Massachusetts State Police, which is a statewide unit specializing in the investigation of traditional and nontraditional organized crime, including illegal gaming.

During my police career, I have participated in more than 15 long-term investigations involving illegal gaming and gaming organizations. Some of those investigations were conducted exclusively by the State Police, and others were conducted cooperatively with local police departments, district attorneys' offices, the United States Attorney's Office, and federal law enforcement agencies including the Federal Bureau of Investigation ("FBI") and the Drug Enforcement Administration. In the course of these gaming investigations, I have conducted physical surveillance of bettors, bookmakers and other people involved in gaming activities. I have worked in undercover assignments where I have placed bets and associated with bookmakers. I have participated in the execution of many search warrants of premises used for betting and bookmaking. I have examined many forms of gaming records that have been seized from bettors and bookmakers and I have worked closely with numerous informants who have been involved in

betting, bookmaking and operating gaming organizations. During my career, I also have participated in lengthy gaming investigations that utilized electronic surveillance (including telephone wiretaps, hidden recording devices or "bugs," and one-party consent interceptions), and during these investigations I have monitored hundreds of hours of gaming-related conversations among people involved in betting, bookmaking and illegal gaming organizations. I have participated in the arrests of more than 50 people for violations of the Commonwealth's gaming laws and have contributed several affidavits in support of wiretap applications which have resulted in Court authorization to utilize electronic surveillance. In addition, I have testified in various courts of the Commonwealth and of the United States regarding illegal gaming charges which were the direct result of my involvement in gaming investigations.

B.      Based upon my experience and training, my investigations of illegal gaming activities, and my conversations with Trooper Nunzio Orlando and other law enforcement officers experienced in the investigation and prosecution of illegal gaming organizations, I have become familiar with the typical structure and operation of gaming organizations. Although differences exist in the structure and operation of different gaming organizations, there are many similarities.

A typical illegal gaming organization is hierarchical and consists of numerous persons organized into a pyramid-like structure. At the pyramid's base are so-called street bookies, who register wagers (usually on athletic contests) from the general public and forward the wagers to one of several local bookmaking offices.

The pyramid's second level consists of these local bookmaking offices, which are managed by agents. The agent of a local bookmaking office typically receives and consolidates wagers from a number of street bookies, as well as from select individuals who wager large sums, and

communicates the wagers, usually by telephone, to an area bookmaking office.

The pyramid's third level consists of area bookmaking offices, each of which normally covers a specific geographic area and/or a particular gaming operation. In addition to receiving and registering wagers from local bookmaking offices, an area bookmaking office furnishes the odds (or "line") to local bookmaking offices and agents. It may also "lay off," or give, a portion of its wagers to other area bookmaking offices in an effort to "balance the books," that is, to decrease the difference in the amounts wagered on opposing parties in a given event.

The fourth and highest level of a typical illegal gaming organization consists of the person in charge, who is responsible for the day-to-day operation of the organization. The person in charge normally furnishes the odds, or "line," to area bookmaking offices for each event on which wagers are being accepted; "balances the books" of each area bookmaking office by "laying off" excess wagers to other offices; collects amounts owed from those who have lost wagers and pays amounts owed to those who have won them; provides credit and/or makes loans to bettors as he sees fit; and provides security for the organization's members. Still higher levels of gaming organizations are known to exist, but the roles played by individuals at these higher levels vary greatly from organization to organization and from one geographical area to another.

In my training and experience, I have learned that the persons in charge of gaming organizations in the greater Boston area frequently communicate and sometimes even affiliate with one another. While persons involved in the highest level of the gaming pyramid might use face to face communications to avoid electronic surveillance, they are often required to use telephones to communicate when face to face communication is not possible.

I have also learned that traditional organized crime families (such as La Cosa Nostra or the Mafia) and other organized crime groups (such as the Winter Hill Gang) in the Boston area have been heavily involved in illegal gaming and bookmaking and have maintained a significant degree of control over organized bookmaking operations. One way in which organized crime families and groups have controlled gaming operations over the years is by extorting "rent" from members of gaming organizations at all levels of the organization. "Rent" is a weekly or monthly payment made by a gaming organization member in return for being allowed to operate without interference. Gaming organization members unwilling or unable to pay "rent" have been threatened with and in some cases have suffered economic harm, physical injury, or death. My own investigations, as well as my conversations with Trooper Nunzio Orlando and other Special Services Section Officers, have revealed that traditional and nontraditional organized crime groups continue to control local gaming operations in the greater Boston area.

C.  During my police career, I have become familiar with, and have utilized, many of the so-called normal investigative procedures used by law enforcement officers to identify, apprehend and successfully prosecute persons involved in illegal gaming operations and conspiracies. These normal investigative procedures include, but are not limited to: physical surveillance; telephone toll analysis; public record analysis; interviews; gathering information from informants; utilizing undercover police officers to place bets or to infiltrate gaming organizations; trash analysis; executing search warrants and; grand jury investigations. I have also become familiar with the practical limitations of these techniques in penetrating organized gaming operations and bringing about the successful prosecution of all participants in such conspiracies.

Gaming organization members, from street bookies to the person(s) in charge, typically conduct their activities in ways that make it difficult, if not impossible, for law enforcement officers utilizing normal investigative procedures to penetrate the organization's higher levels. For example, most business that occurs at the organization's highest levels including the "laying off" of wagers, the furnishing of the "line," and the "balancing of books" across geographical areas and operations is usually conducted over the telephone. These telephones are often ordered, installed, and paid for under the names of fictitious or uninvolved persons. The telephone numbers used also may be changed at frequent and irregular intervals to help avoid detection.

Telephone activity that occurs at the organization's lower levels i.e., between area and local bookmaking offices, or between these offices and street bookies is likewise difficult to monitor using normal investigative procedures. One reason is that the activity frequently takes place over pay telephones, and telephone company records for pay telephones provide little if any useful data. Even in cases where organization members use ordinary telephones, the billing records are frequently unhelpful, because local and area bookmaking offices are commonly situated within geographic areas with so-called wide area toll-free telephone service. Telephone company records for such toll-free calls provide little data, if any, useful for normal investigative purposes. While cellular telephone records may contain more toll information, the mobility of the cellular telephones make it difficult to prove who used the cellular telephones without additional information or surveillance.

Members of gaming organizations also make extensive use of call forwarding which is a service provided by telephone companies to subscribers for an additional monthly charge. Call forwarding allows a person automatically redirect incoming calls for a particular telephone to another telephone that can be nearby or at a remote location. The feature is activated when the

subscriber enters on his telephone a prefix (in the Boston or Framingham area this is often "*72") followed by the telephone number of a second telephone, to which calls are to be forwarded. A person calling a telephone with the call forwarding feature activated receives no indication that the call is being forwarded to another location. The call forwarding feature can be activated or de-activated almost instantly, without limitation and without technical assistance by the telephone company. In addition, the call forwarding feature can be activated from a remote location. Together, these two features permit a local bookmaking office to conduct business at a location other than the location of the subscriber's telephone. This practice further insulates those offices from detection by normal investigative procedures.

Members of gaming organizations often utilize portable cellular telephones and paging devices, which enable them to carry on their illegal gaming business at any time and from nearly any place. The mobility provided by cellular telephones and paging devices hampers the effectiveness of normal investigative procedures.

When conducting activities other than by telephone, illegal gaming participants often resort to counter-surveillance techniques such as arranging their meetings at isolated locations where surveillance officers would be conspicuous. In addition, local and area bookmaking offices are quite commonly located in private homes or high-security apartment complexes, where family members, neighbors, other tenants, security guards, and/or doormen can keep an eye out for surveillance officers and warn the investigation's targets of the surveillance. Bookmaking offices also are moved at irregular intervals to avoid detection and can be moved on a moment's notice if police surveillance is suspected. Back-up locations equipped with working telephone lines are kept in reserve should it be necessary to move a bookmaking office on short notice, thus enabling the organization to

continue its operations uninterrupted.

Trash analysis, though useful in some investigations would compromise this investigation for the following reasons: (1) I believe that the main target and subjects of this investigation engage in counter-surveillance and would detect someone going onto or near their property; and (2) the subjects of this investigation have learned through experience not to put evidence of gaming and other illegal activities in their trash.

Bookmakers and bookmaking offices often communicate with each other via facsimile ("fax") machines. The use of fax machines allows a great deal of data, such as "lines," schedules, records of bets registered and amounts of money won and lost, to be communicated quickly and in writing. Fax machines are also perceived to be more secure than telephones because it is generally more difficult and expensive for law enforcement officers to intercept fax communications than telephone conversations.

Records kept in the normal course of an illegal betting organization's business, including memoranda of wagers taken and monies owed or receivable, are often recorded on water soluble paper, or "flash" paper. This allows for the immediate destruction of physical evidence should a gaming office be raided by law enforcement officials.

High-level members of illegal gaming organizations conduct business only with individuals they know and trust. It is therefore extremely difficult, if not impossible, for undercover officers or informants to successfully infiltrate the higher ranks of such organizations. Moreover, members of illegal gaming organizations attempt to keep close ties with public employees who know about, and will tell them about, efforts by law enforcement to penetrate the organization.

D.      During the week ending July 5th, 2003, this affiant and Trooper Nunzio Orlando received information from a confidential informant who in the past has provided both of us with information that has proven to be reliable and true. This informant told myself and Trooper Orlando that he/she was placing illegal wagers on sporting events over telephone being numbered (617)- 567-6114 with Gregory Tzannos. This affiant and Trooper Orlando know Gregory Tzannos to be involved with the bookmaking business from information obtained from past investigations (Gregory Tzannos was not a target) coupled with intelligence from other informants as well as this informant. This informant will hereinafter be referred to as "CI-1". This affiant and Trooper Orlando have known "CI-1" for more than two years, and "CI-1" true identity and residential address are known to us. "CI-1" has agreed to provide information to this affiant and Trooper Orlando about this illegal gaming operation only if his/her identity is not revealed. "CI-1" has admitted to myself and Trooper Orlando that he/she has been involved with illegal gaming for more than ten years. During this period of time, "CI-1" has placed illegal gaming wagers on professional and college sporting events with a number of Boston area bookmakers. During our relationship with "CI-1", "CI-1" has provided information regarding the illegal bookmaking operations of several people. In each case, "CI-1" provided information relating to the identities of bookmakers which was subsequently corroborated by this affiant and Trooper Orlando to be truthful. In one case, "CI-1" was able to particularly describe the activities and locations utilized by a bookmaker. For example, in one particular instance "CI-1" provided a telephone number related to an illegal bookmaking office. "CI-1" was also able to identify the bookmakers who utilized this telephone number. Officers of the Special Service Section were able to corroborate this information during several surveillances. On numerous occasions the bookmakers would

arrive and depart from the location associated with the aforementioned telephone number during prime gaming hours. As a result of the information provided by "CI-1", a search warrant was executed 161 Salem Street, Suite 7, Medford, Massachusetts, in Middlesex County on October 28, 2002, wherein the bookmakers were present. A large number of illegal betting records were seized which was consistent with the information provided by "CI-1". Upon execution of said search warrant, this affiant and other law enforcement personnel present, arrested Anthony Bonfilio, Gregory Chenevert, and James Bonfilio for gaming violations. On June 27, 2003, all three subjects were convicted of Gaming Violations and fined $1500.00. In addition, on several occasions "CI-1" has provided general intelligence information regarding criminal matters which this affiant substantiated as being true. Citing the particulars of these cases would, in the opinion of this affiant, compromise the anonymity of the confidential reliable informant making him/her susceptible to physical harm and/or retribution. This confidential reliable informant is not receiving any compensation or remuneration of any sort for the information provided to this officer.

E. On July 10th, 2003, records obtained by Administrative Subpoena from the Verizon Telephone company with regard to the telephone numbered (617)-567-6114 revealed that this number is a non published telephone number subscribed to by Gregory Tzannos and installed upon the premises of 73 Lubec Street, Floor 1, East Boston, Massachusetts.

F. A check with the Registry of Motor Vehicles of Massachusetts revealed that Gregory F. Tzannos has an active Massachusetts drivers license which expires on 12/30/07. In addition, Gregory Tzannos mailing and residential address is 10 Siasconset Drive, Bourne, Massachusetts. Furthermore, I reviewed a digitized photo of Gregory Tzannos from the Registry of Motor Vehicles

9

and know this to be Gregory Tzannos. In addition, I showed "CI-1" the same photo and "CI-1" stated to me that it was Gregory Tzannos, the person that he/she places wagers with. Furthermore, it was also learned from the Registry of Motor Vehicles that Gregory Tzannos does not have any vehicles registered.

G.    Due to the fact that bookmakers tend to keep records of wagers bet by their customers, to detail "CI-1's" activities would in this affiant's opinion jeopardize his/her anonymity. Furthermore, it is common for bookmakers to insulate themselves from law enforcement detection, thus many bookmakers rent and/or use apartments, houses, or buildings that are not their homes, to conduct their illegal gaming business. In addition, the call forwarding feature is also being used in this case in which I have outlined below.

H.    On August 13th, 2003, a request was made via a Administrative Subpoena to the Verizon Telephone company with regard to the telephone numbered (617)-567-6114 to check call forwarding during gaming hours on August 13th, 2003, August 16th, 2003 and August 17th, 2003.

I.    On August 14th, 2003, it was learned from the Verizon Telephone Company that telephone numbered (617)-567-6114 was call forwarded to telephone number (617)-846-6630. Telephone numbered (617)-846-6630 is listed to DBA: American Eagle Purchasing Agents, 381 Winthrop Street, Floor 2, Winthrop, Massachusetts. The person listed on the telephone bill is Gregory Tzannos. A further check with the Massachusetts State Police Corporate Records Division revealed that the above listed company is active and located at 381 Winthrop Street, Winthrop, Massachusetts. In addition, Gregory F. Tzannos is listed as the Treasurer and Registered Agent.

J.     On August 18th, 2003, this affiant was informed via the telephone from the Verizon Telephone Company Security Division, that telephone numbered (617)-567-6114 was call forwarded to telephone numbered (617)-846-6630 during gaming hours on August 16th, 2003 and August 17th, 2003. In addition, on this date, I spoke with "CI-1" and was advised that he/she had placed several wagers with Gregory" Tzannos over telephone numbered (617)-567-6114 during the above listed dates.

K.     On August 18th, 2003, at approximately 6:20P.M., this affiant conducted a surveillance of 381 Winthrop Street, Winthrop, Massachusetts. During this time I observed two motor vehicles parked on the premises: 1.) MA registration 9337BG, a 1993 Volvo 940 sedan, color black, registered to a Linda Wagner, date of birth 7/23/47, with an address of 381 Winthrop Street, Winthrop, Massachusetts and 2.) MA registration 896EJJ, a 1989 Dodge Caravan, color gray, registered to the above Linda Wagner. In addition, " CI-1" informed me that Gregory Tzannos has a girlfriend by the first name of Linda.

L.     On August 19th, 2003, at approximately 6:20P.M., Trooper Orlando conducted a surveillance of 381 Winthrop Street, Winthrop, Massachusetts. During this time Trooper Orlando observed the same two above listed vehicles parked on the premises.

M.     On August 20th, 2003, at approximately 6:20P.M., Trooper Orlando conducted a surveillance of 381 Winthrop Street, Winthrop, Massachusetts. During this time Trooper Orlando observed the above listed vehicles parked on the premises. In addition, Trooper Orlando spoke with "CI-1" and was advised that he/she had placed a wager(s) with Gregory over telephone numbered (617) 567-6114 during the gaming hours of the above listed date.

N.      On August 25th, 2003, at approximately 6:00P.M., Trooper Russolillo conducted a surveillance of 381 Winthrop Street, Winthrop, Massachusetts. During this time this affiant observed two motor vehicles parked on the premises. On this date during gaming hours, "CI-1" placed a controlled telephone call to telephone numbered (617)-567-6114. ( It should be noted that a controlled gaming call is essentially an investigative method of verifying the accuracy of an informants information. Generally these calls are conducted during the specified gaming periods, and closely monitored by a member of law enforcement. During this occurrence, the investigator personally dials the specified telephone number, and remains on the line until the call is answered by the registering agent, subsequent to which the telephone is given to the cooperating individual and the ensuing conversation is monitored by the officer present.) "CI-1" stated that the person on the other end of the telephone answered and proceeded to give a run down of all the scheduled baseball lines. "CI-1" also informed this affiant that the person that answered the telephone was Gregory Tzannos.

O.      Based on the above information, it is this affiant's opinion that Gregory Tzannos utilizes 381 Winthrop Street, Winthrop, Massachusetts, as a place to conduct his illegal gaming business.

P.      On August 26th, 2003, at approximately 6:45P.M., this affiant conducted a surveillance of 381 Winthrop Street, Winthrop, Massachusetts. I observed the above listed vehicles registered to Linda Wagner parked on the premises.

Q.      Based upon the aforementioned reliable information, this affiant's personal knowledge and belief, the observations, opinions, and belief of other law enforcement agents involved in this investigation, it is this affiant's opinion that there is probable cause to believe that the person or persons in 381 Winthrop Street, Winthrop, Massachusetts, are committing violations of

Massachusetts General Laws Chapter 271, Section 17 and 17A, and that the premises is being utilized in furtherance of this criminal activity. The information cited in this affidavit establishes a pattern of criminal conduct, specifically, illegal gaming activities, to wit, the registering of bets upon the result of a trial or contest of speed, skill or endurance, on athletic contests, and the illegal use of the telephone to accomplish same.

R.     The property for which I seek issuance of a search warrant is the following: books, records, documents, including any and all written accounts, ledgers, monies, safety deposit box keys, apparatus and devices, including cassette recordings which are being used in violation of Massachusetts General Laws, chapter 271, section 17 and 17A, and are being used for the purpose of registering bets upon the result of a trial or contest of speed, skill, or endurance of man; to wit, athletic contests.

S.     It is respectfully requested that the court issue a search warrant authorizing the search of the room and or rooms which constitute and comprise the premises of 381 Winthrop Street, Winthrop, Massachusetts. The premises located at 381 Winthrop Street, in the city of Winthrop, Massachusetts is specifically described as a one family, three story, wood structure, white siding with black shutters. The numeral "381" is clearly marked in black located on the center pillar of the front porch. In addition, the front door is blue in color.

This affidavit subscribed and sworn to by me consists of fifteen (15) pages, the first not being numbered.

This affidavit is signed under the pains and penalties of perjury.

_____
Signature of Applicant

Then personally appeared the above named Pasquale F. Russolillo and made oath that the foregoing affidavit by him subscribed is true.

Before me this 28th day of August 2003

*[signature]*

Clerk or Assistant Clerk of the Court

## ADDENDUM A TO SEARCH WARRANT
### For
### 381 Winthrop Street,
### Winthrop, Massachusetts

1.      Books, papers, documents, records, including written and computer generated records, evidencing the unlawful placement, receipt and registration of bets on the outcome of sports events, including, but not limited to records of bets registered; records of bets placed; records of the amounts of money won or lost on account of bets; records of the amounts of money due or owed on account of bets; records of the amounts of money paid or collected on account of bets; records of the names, telephone numbers, and addresses of bettors, bookmakers, "agents" and gaming offices; records of amounts of money earned by, paid to "agents", including "make-up figures" and commissions.

2.      Records, papers, statements, receipts, bills and notations reflecting financial transactions and financial condition, including, but not limited to bills, receipts and records pertaining to the purchase and sale of goods and services; credit card statements; monthly bank statements and records of bank deposits and withdrawals; loan documents and other documents evidencing debt; investment account statements and records of purchases and sales of stocks, certificates of deposit, bonds and other financial investments; tax returns; statements of income and gains, including income from employment, dividends and interest; and safe deposit box lease records.

3.      Money relating to the unlawful registration of bets, including money won and lost on account of bets on the outcome of sports events;

4.      Computers and related hardware, such as modems, monitors, CPU's and printers, and computer software used to facilitate the unlawful registration of bets, including database, word processing and communications software;

5.      Other paraphernalia used to facilitate the unlawful registration of bets, such as telephones, cellular telephones, beepers, facsimile machines and adding machines.



0022

## ADDENDUM B TO SEARCH WARRANT
### For
### 381 Winthrop Street
### Winthrop, Massachusetts

The premises located at 381 Winthrop Street, in the city of Winthrop, Massachusetts, including the room or rooms of said apartment, including the attic, garage, and storage areas is specifically described as a one family, three story dwelling with white siding. Looking at the home from the street, the numeral "381" is displayed on the center pillar. The front door is of a light blue color.



0023

A search warrant must be executed as soon as reasonably possible after its issuance, and in any case may not be validly executed more than 7 days after its issuance. The executing officer must file his or her return with the court named in the warrant within 7 days after the warrant is issued. G.L. c. 276, §3A.

The search warrant was issued on **August 28**, **2003**, and I have executed it as follows.

The following is an inventory of the property taken pursuant to this search warrant:

1. Numerous slips of paper w/ gaming notations
2. Numerous cassette tapes
3. (1) Motorola Gaming Pager #063E0119816
4. (2) Passports
5. (1) Blow Gun w/ needles
6. (3) switch Blades
7. (1) pair of Brass knuckles
8. (1) Rolodex w/ telephone #'s
9. (1) bag containing various rounds of ammo
10. (1) Box w/ 50 .38 cal bullets
11. (1) Replica Black Powder handgun
12. (1) .38 cal Bullet
13. (1) 12 gauge shotgun shell
14. (1) sawed off shotgun 2 barrel #26631 new Baker
15. (1) Smith/Wesson .38 cal Revolver Model 10-8 loaded #6D59930
16. (1) Raven .25 cal semi auto 5 loaded rounds w/ holster Model MP25 #912093
17. (1) Colt .38 cal special revolver 6 loaded rounds/holster #82788
18. (3) Voice Activated Cassette Tape Recorders (2) Radio Shack (1) Realistic
19. $10,200 in American Currency
20. 

(attach additional pages as necessary)

This inventory was made in the presence of: **OLT JOHN TUTUNGIAN**

I swear that this inventory is a true and detailed account of all the property taken by me on this search warrant.

| SIGNATURE OF PERSON MAKING SEARCH | DATE AND TIME OF SEARCH | SWORN AND SUBSCRIBED TO BEFORE |
|---|---|---|
| X | 8-28-03  1930 hrs | X _signature_ |
| | | Signature of Justice, Clerk-Magistrate or Assistant Clerk |
| PRINTED NAME OF PERSON MAKING SEARCH | TITLE OF PERSON MAKING SEARCH | DATE SWORN AND SUBSCRIBED TO |
| Pasquale Russolillo | Trooper | 8/29/03 |

0026