UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE

2005 MAR -9  P 3: 41

U.S. DISTRICT COURT
DISTRICT OF MASS.

UNITED STATES OF AMERICA,

v.

GREGORY F. TZANNOS,
  a/k/a GREGORY F. TZANNAS

Criminal No. 04-10193-JLT

## REPLY BRIEF IN FURTHER SUPPORT OF MOTION
## FOR A *FRANKS* HEARING

    In his Motion for a *Franks* Hearing, Mr. Tzannos alleged that, in order to obtain a search warrant, Massachusetts State Police Trooper Pasquale Russolillo intentionally and falsely told the East Boston District Court that he had an informant who gave incriminating information about Mr. Tzannos. The defense did not make its allegations lightly, and it certainly did not make them without cause. To be sure, it conducted a thorough investigation and a thorough analysis of the documents that the police had seized. Appended to that Motion was an Affidavit of Counsel, which referred to and explained seventeen (17) exhibits.

    Not surprisingly, the prosecution has opposed the Motion. But, instead of responding to Mr. Tzannos's allegations head-on, the prosecution tries to obfuscate the real issue: *whether Trooper Russolillo intentionally lied about material facts under oath*. Behind a screen of smoke and mirrors, the prosecution has done nothing more than parse Mr. Tzannos's submissions, piece by piece, line by line, arguing that Mr. Tzannos did not "meet his burden of making a `substantial preliminary showing.'" Pros. Br. at p. 1. Its

efforts, however, fall far short, and this Court can reach only one logical conclusion: Mr. Tzannos is entitled to an evidentiary hearing.

The prosecution's specific complaints about the sufficiency of Mr. Tzannos's submission are addressed below.

### 1. The Police Seized All Tapes and Records from August, 2003.

The prosecution complains that Mr. Tzannos's affidavit did "<u>not</u> say that the state police obtained tapes and records of <u>all</u> of his illegal gaming activities on August 16, 17, 20 and 25, 2003." Pros. Br. at p. 5 (emphasis in original).

As to the completeness of the records, Mr. Tzannos's supplemental affidavit explains When the police executed the search warrant, they thoroughly searched his entire house for two to three hours. Ultimately, they seized every single paper and record from the third floor of his home, including all papers and records from August, 2003. *See* Exh. A. (Notably, Russolillo described the third floor as "a gaming office, with three tables, each table was equipped with telephones, voice activated cassette recorders, gaming slips, pens, calculator, line sheets and other gaming materials." Exh. C). And, as the report makes clear, officers seized many, many items including "numerous papers with gaming notations, cuff sheets, line sheets, past dated cassette tapes, recorders and other gaming materials." Exh. C.

Furthermore, Mr. Tzannos has signed a supplemental affidavit explaining that, not only did the police seize each and every tape from August, 2003, but they seized all of the tape recorders as well. *See* Exh. A.

2

### 2. Counsel's Description of the Contents of the Relevant Audiotapes is Accurate.

Notably, the prosecution does not allege that the defense improperly interpreted any of the ledger sheets, play or lines. Instead, it simply complains that neither Mr. Tzannos nor Ms. DeJuneas "explain how particular seized tapes ...can be shown to relate to particular dates and specific telephone lines." Pros. Br. at p. 5.

As explained in counsel's supplemental affidavit, counsel – aided by Mr. Tzannos – was able to determine which tapes recorded calls on dates by simply listening to the conversations, and comparing the discussions to the lines for each day. *See* Exh. B. The prosecution certainly is capable of doing so as well. And as for matching the tapes to different telephone numbers, counsel simply referred to the affidavits, which indicated the telephone numbers each affiant used. *See id.*

### 3. Defense Counsel Personally Drafted Each Affidavit.

Seizing upon a single pronoun amongst many, many pages of briefing, documents, and affidavits, the prosecution would have this Court believe that the defendant -- not counsel -- drafted each of the bettors' affidavits himself, then handed them over to defense counsel (who then filed them in this Court, all the while attempting to obscure who actually wrote the affidavits). *See* Pros. Br. at p. 6.

Not only is that allegation insulting to the integrity of counsel, but it is preposterous. The prosecution's strained reading of the brief and affidavits simply does not make sense. But for the sake of efficiency, counsel will not go through the pains of explaining the fallacy of the prosecution's arguments, and simply offers a supplemental affidavit, explaining that prior to filing the Motion:

- counsel personally interviewed most[1] of the affiants;

- the affiants told counsel they were not the informants;

- counsel knew the true name of each affiant; and

- Ms. DeJuneas personally drafted each and every affidavit.

*See* Exh. B.

And, in her Supplemental Affidavit, Ms. DeJuneas states, under oath, that she has since personally interviewed the remaining affiants, each of who confirm that they signed the affidavits and that the affidavits are true and accurate.

### 4. The Affidavits Were Filed In Redacted Form For Good Cause.

Next, the prosecution complains that the affidavits of bettors and callers "do not contain any signatures." But, this Court can tell, the affidavits were signed; the signatures were simply redacted.

As for why the affidavits were redacted, Ms. DeJuneas explained in her initial affidavit that the affiants' full names were redacted to "protect [the affiants] from being charged with any crime as a result of their cooperation." Counsel went on to say that, "[i]f this Court so requires, Mr. Tzannos will submit unredacted copies of the affidavits under seal."

---

[1] The only affiants that counsel did not personally interview did not come anywhere close to meeting Russolillo's description of CI-1. For example, counsel did not personally interview Chris; Chris, however, called on only one of the four relevant dates. Counsel did not personally interview Keith, but Keith called on only two of the four relevant dates. Finally, although counsel did speak to Bev on one occasion, counsel did not interview her at length. Bev never called the telephone number referenced in Russolillo's affidavit. Bev was understandably nervous about getting involved, and counsel spoke to her significant other at length about Bev's affidavit. He in turn spoke to Bev, who mailed the signed affidavit to counsel. *See* Exh. B.

**CONCLUSION**

In short, the defense has identified each and every person who could possibly be CI-1. And each and every one of these people has signed an affidavit, denying under oath, that s/he is Russolillo's informant. Certainly such proof is sufficient to make a substantial preliminary showing that Russolillo made intentional misrepresentations about the sole informant he relied upon to secure the warrant.

For these reasons, as well as those set forth in Mr. Tzannos's principal brief, Mr. Tzannos respectfully requests that this Court grant his Motion.

> Respectfully Submitted,
>
> The Defendant,
>
> GREGORY TZANNOS
> By his attorneys,
>
> _____
> Patricia A. DeJuneas (BBO No. 652997)
> Richard M. Egbert (BBO No. 151800)
> The Law Offices of Richard Egbert
> 99 Summer Street, Suite 1800
> Boston, MA 02110
> Tel: (617) 737.8222

**CERTIFICATE OF SERVICE**

I, Patricia A. DeJuneas, hereby certify that I caused this document to be served by hand delivery upon on Assistant United States Attorneys Frederick Wyshak and Michael Tabek, this ___ day of March 2005.

> _____
> Patricia A. DeJuneas

5

## Supplemental Affidavit Of Gregory Tzannos

I, Gregory Tzannos, hereby depose and say:

1. I understand the obligations of an oath.

2. When the police executed the search warrant on August 28, 2003, they thoroughly searched my entire house.  The search lasted for approximately 2 to 3 hours.

3. They seized every single paper and record from the third floor of my home, including all papers and records from August, 2003 .

4. The police also seized each and every audio cassette from August, 2003, as well as all of the tape recorders I had.

5. I did not draft any of the papers that were submitted to the Court on my behalf.

Signed and sworn under penalties of perjury this 6th day of March, 2005:

Gregory Tzannos

## Supplement Affidavit of Counsel

I, Patricia A. DeJuneas, hereby depose and say:

1. As explained in my earlier affidavit, I, along with Richard M. Egbert, represent Mr. Tzannos in this case.

2. I offer this supplemental affidavit in support of Mr. Tzannos's Reply Brief in Further Support of Motion for a *Franks* Hearing.

3. In my initial affidavit, I analyzed and provided this Court with copies of documents from four dates:  August 16, 2003; August 17, 2003; August 20, 2003; and August 25, 2003.  Each and every one of these documents had been seized from Mr. Tzannos's home.

4. Attached hereto as Exh. 1 is a chart that I drafted.   It is based upon the documents provided by the defense, as well as the affidavits discussed below. The chart shows the following:

   a. Each person who placed a bet on August 16, 2003;
   b. Each person who placed a bet on August 17, 2003;
   c. Each person who placed a bet on August 20, 2003;
   d. The telephone number each person called; and
   e. Each person who called telephone numbers (617) 567-6114; (617) 561-0941; and (617) 846-4970 on August 25, 2003.

5. As one can see from the chart, not a single person fits Trooper Russolillo's description of CI-1.  That is, not a single person called (617) 567-6114 to place bets on August 16, 17, and 20, 2005 and/or called the same number on August 25, 2005.

6. Nevertheless, counsel (Attorney Egbert and myself) decided, in an abundance of caution, to obtain affidavits from each person who called on each relevant date.

7. I personally drafted each and every one of those affidavits.

8. Each affiant's true identity is known to me.

9. Prior to filing the Motion, I personally interviewed:

   a. Ernie;
   b. Fisher;
   c. Jerry;
   d. Norton;
   e. Ted;
   f. Tuna; and

g. Fredly.

10. Attorney Egbert also spoke to at least two affiants.

11. Because each affiant feared retribution from law enforcement, I and/or Attorney Egbert promised not to reveal their true identities to the prosecution or any law enforcement officer.

12. Each affiant that I and/or Attorney Egbert spoke to denied being an informant.

13. Prior to filing the Motion for a *Franks* Hearing, I did not personally speak to Chris, Bev, Keith, or Paulie. I did, however, draft their affidavits and they were instructed to call me if they had any questions, or if there were any inaccuracies in the affidavits.

14. Neither Chris, Bev, Keith, nor Paulie could possibly be the informant:

   a. First, Chris placed a bet on only one of the relevant dates (8/16/03);
   b. Second, Bev never called the telephone number specifically identified by Trooper Russolillo;
   c. Third, Keith placed bets on only two of the relevant dates (8/16/03 and 8/17/03); and
   d. Fourth, Paulie did not place bets on any of the relevant dates, nor does he fit the description of the caller on August 25, 2003 (*i.e.*, he did not receive "a run down of all the scheduled baseball lines.")

15. Since the Motion was filed, I have personally spoken to Chris, Keith, Paulie and Bev. Each confirmed that they signed the affidavit that I drafted, and each confirmed that the contents of the affidavits were true and accurate.

16. I listened to the tapes produced by the prosecution. The vast majority of the tapes are blank. As for the tapes that do contain recordings, I, with assistance from Mr. Tzannos, was able to determine the dates of each tape by comparing the conversations on the tapes to the documents that were seized.

17. I was able to determine which tapes recorded incoming calls on particular telephone numbers because the affidavits state which people called each number. For example, I know from the affidavits which people called (617) 846-4970, which people called (617) 567-6114, and which people called (617) 561-0941.

Signed and sworn under pains and penalties of perjury this ___ day of March, 2005:

Patricia A. DeJuneas

| Relevant Dates | August 16th CI allegedly places wager over telephone number (617) 567-6114 | August 17th CI allegedly places wager over telephone number (617) 567-6114 | August 20th CI allegedly places wager over telephone number (617) 567-6114 | August 25th CI allegedly places controlled call to (617) 567-6114 |
|---|---|---|---|---|
| **Bettors/Callers** | | | | |
| | Chris | | | Paulie |
| | Ernie/Bev* | Ernie/Bev* | Ernie/Bev* | Bev* |
| | Fisher* | Fisher* | Fisher* | Fisher* |
| | Jerry | | | Jerry |
| | Keith | Keith | | |
| | Norton | Norton | | Norton |
| | Ted* | | | |
| | Tuna** | Tuna** | Tuna** | Tuna** |
| | | | | Fredly** |

\*     These callers did not call the number referenced in Russolillo's affidavit; they called (617) 561-0941.

\*\*    These callers did not call the number referenced in Russolillo's affidavit; they called (617) 846-4970.

Massachusetts State Police   Special Service Section

| Region SSS East | | Case# 2003-032-0036 | |
|---|---|---|---|
| | | Related Cases | |
| **Report Type:** Arrest | | **Preliminary Draft** | |

| Date & Time: | | Location: | |
|---|---|---|---|
| Day of Week: Thursday | | Dba: | |
| Incident Date: 08/28/2003 | | Street: 381 Winthrop Street | |
| Incident Time: 07:20 PM | | City: WINTHROP | |
| Date Submitted: 09/04/2003 | | State: MA | |
| Subjects: | | Officers: | |
| TZANNOS Gregory;12/30/1946 | | Reporting Officer: RUSSOLILLO Pasquale F | |
| | | Assisting Officers: FOLEY Timothy E, ORLANDO Nunzio, Tutungian, John | |

**Report Summary:**
Search of 381 Winthrop Street, Winthrop, Ma. The arrest of Gregory Tzannos

On August 28th, 2003, I submitted an affidavit to Clerk Magistrate Joseph Faretra of the East Boston Court, seeking authorization for a search warrant for 381 Winthrop Street, Winthrop, Massachusetts. Based on the facts and circumstances explained in my affidavit, I was granted the search warrant.

On this date at approximately 7:25 P.M., this affiant, Detective Lieutenant John Tutungian, Trooper Timothy Foley, and Detective Judy Racow, and one uniformed officer (both from the Winthrop Police Department), made a peaceful entry into the above listed address. I identified myself to the female that answered the door (later identified as Linda Wagner). I explained that we had a search warrant for the location and for Gregory Tzannos. Miss Wagner stated that Gregory was up on the third floor. Myself and Trooper Foley went up stairs to the third floor and encountered Gregory Tzannos. Mr. Tzannos walked out from a room that was set up as a gaming office, with three tables, each table was equipped with telephones, voice activated cassette recorders, gaming slips, pens, calculator, line sheets and other gaming materials. I showed Tzannos the search warrant and explained to him the reason why we were there. We then were joined by Detective Lieutenant John Tutungian. At this point with Detective Lieutenant Tutungian and Trooper Foley present, I advised Tzannos that he was under arrest and read to him his rights per Miranda. Tzannos stated that he understood his rights. Trooper Foley then handcuffed Tzannos. Tzannos stated to me that he had a small gaming operation with approximately twelve customers. Tzannos said that his business was slow because it was baseball season. I explained to Tzannos that based on his gaming office and the number of telephone calls received and fielded during the execution of the warrant, it was my opinion that his gaming operation was larger than what Tzannos was describing. Detective Lieutenant John Tutungian and Trooper Foley answered the gaming telephones and accepted wagers on sporting events that were scheduled on this date. I then proceeded to ask Tzannos if he had any weapons or money that were secured in his home. Tzannos stated to me that he had several hundred dollars in his office desk drawer, which was located on the second floor.

1.

Detective Lieutenant Tutungian secured the gaming office and myself and Trooper Foley escorted Tzannos to the second floor office. Upon entering the room, I observed an old - style hand gun on a table which was located on the left side of the office. I immediately advised all of the officers, for officer safety, of the discovery of the weapon. I turned to Tzannos and asked him if he had any other weapons. Tzannos said no. Tzannos explained to me that the hand gun was a replica. Tzannos then said that he had money hidden behind the clock that was located on the wall to the left of the closet. I reached up and grabbed a stack of United States Currency. (later determined to be $8760.00) I asked Tzannos what the money was for. Tzannos said that he paid his bills with this and that the money was generated from his gaming operation. I asked Tzannos which bills he meant and Tzannos stated his "house bills", along with moneys needed to pay his gaming customers. I then began to search the desk drawers. (The several hundred dollars Tzannos explained to me that he had was located in the middle drawer). (I gave this money to Tzannos). I continued to search and opened the top right hand desk drawer. Inside the drawer, I saw a small brown bag. I felt the bag and stated to Trooper Foley that I believed I had located another gun. I seized the bag and inside the bag was a loaded .25 Raven Caliber Semi automatic MP 25, with five rounds and a safari holster, serial number 912093. I advised Tzannos ( who was standing next to me ) again of his Miranda Rights. Tzannos again stated that he understood. I asked Tzannos if he had any other weapons. Tzannos said that he had a shot gun inside the closet. Trooper Foley searched the closet and located up against the wall was a "sawed off" shotgun, along with a bag of several different types of ammunition. I continued my search of the desk and inside the bottom right drawer was a purple bag. Located in the bag was a loaded .38 Colt Special with six rounds and a holster, serial number 82788. I again asked Tzannos if he had any other weapons in the house. Tzannos stated that he had another loaded hand gun inside his bedroom.

I then escorted Tzannos into his bedroom. Tzannos stated to me that the gun was in between the mattress and box spring on the left side of the bed. I asked Trooper Foley to enter the bedroom and witness the following: I picked up the mattress and found a loaded Smith and Wesson .38 Caliber with six rounds, Model 10-8 serial number 6D59930. I asked Tzannos which side of the bed he slept on and he stated to me that he slept on the left side. Tzannos stated to me that the gun belonged to him, along with the other guns that were found. In addition, I found an envelope on the bedroom bureau with the initial "E" on it. Inside the envelope was ninety dollars in United States Currency. Tzannos explained to me that the money was from a gaming customer by the name of Ernie and that Ernie had dropped off the money.

I was then informed by Detective Lieutenant Tutungian that he had located in the office, fifteen envelopes similar to what I had found in the bedroom. I brought Tzannos back into the second floor office. Detective Lieutenant Tutungian showed me the envelopes. The envelopes had the same marking as the envelope found in the bedroom. In addition, I was shown a green piece of paper that had notations indicating that " Ernie" had taken out a loan of three thousand dollars with Tzannos and that Tzannos was charging three percent a week. ( that would add up to ninety dollars a week). Furthermore, inside each envelope was ninety dollars. Based on this, I again read Tzannos his rights per Miranda and he stated he understood same. I asked him questions regarding the above. Tzannos said to me that he did not want to answer any more questions at this point. Tzannos also refused to sign the Miranda Rights Form. Tzannos was later transported to the State Police Barracks in Revere, advised of his rights, booked and held for court.

Arrest 08/28/2003

Massachusetts State Police                                              Special Service Section

I advised Linda Wagner of her rights per Miranda and she replied that she understood. I explained to her that I was aware that at times she would answer the gaming telephones for Gregory Tzannos. Miss Wagner told me that she only helped out a few times. I then asked her about the weapons that were found in the house. Miss Wagner said to me that she was only aware of the weapon that was in the bedroom. Also during the search, I called Tzannos attorney Michael Cioffi and advised him of the situation. I also explained to Cioffi that his client had been read his Miranda Rights.

During the course of this search, officers located and seized numerous papers with gaming notations, cuff sheets, line sheets, past dated cassette tapes, recorders and other gaming materials. In addition to the above mentioned gaming material and weapons, officers found a "blowgun" with needles, a replica black powder hand gun, three switch blade knives, a pair of brass knuckles and several different types of ammunition. All of the evidence was seized and transported to the State Police Barracks in Framingham. Trooper Foley brought the firearms to the State Police Crime Lab for testing. It should be noted that the sawed off shotgun was reported stolen from the State of Georgia.

Gregory Tzannos was charged with several gaming and firearm violations.

**APPROVAL PENDING**

Arrest 08/28/2003

3