FILED
IN CLERKS OFFICE

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

2005 FEB 29  P 3: 28
MAR 1

U.S. DISTRICT COURT
DISTRICT OF MASS.

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) Criminal No. 04-10193-JLT |
| -v.- | ) |
| | ) |
| GREGORY F. TZANNOS, | ) |
| a/k/a GREGORY F. TZANNAS, | ) |
| | ) |
| Defendant. | ) |

### GOVERNMENT'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR A *FRANKS* HEARING

The government hereby opposes defendant Gregory Tzannos's motion for a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), to challenge the accuracy and truthfulness of the affidavit ("Russolillo Aff.") that Massachusetts State Trooper Pasquale F. Russolillo submitted in support of a search warrant that was issued and executed at Tzannos's house on August 28, 2003.

Tzannos's motion should be swiftly rejected, because Tzannos has utterly failed to meet his burden of making a "substantial preliminary showing," *see Franks*, 438 U.S. at 155-56, that Trooper Russolillo knowingly and intentionally made false statements that were material to probable cause in the search warrant affidavit.

#### Uncontested Facts

In his motion, Tzannos does not contest most of the facts set forth in Trooper Russolillo's search warrant affidavit.

First, Tzannos does not dispute Trooper Russolillo's qualifications and experience. In particular, Tzannos does not dispute that as of August 28, 2003, the date of the search warrant affidavit, Trooper Russolillo (a) was an experienced law enforcement officer, with 15 years' experience (Russolillo Aff. ¶ A), who had, among other things, (b) developed substantial experience

Page 2

and expertise regarding illegal gambling organizations (Russolillo Aff. ¶¶ A-C); (c) participated in more than 15 long-term investigations involving illegal gambling (Russolillo Aff. ¶ A); (d) worked on joint investigations with the Federal Bureau of Investigation, the Drug Enforcement Administration, the United States Attorney's Office, and a number of district attorneys' offices and local police departments (Russolillo Aff. ¶ A); and (e) testified both in Federal and state courts (Russolillo Aff. ¶ A).

Second, Tzannos does not dispute Trooper Russolillo's extensive knowledge of how illegal gambling businesses -- such as Tzannos's -- operate, including Trooper Russolillo's description of the structure of illegal gambling operations (Russolillo Aff. ¶ B), and the use of call forwarding by illegal gambling businesses (Russolillo Aff. ¶ C, G).

Third, Tzannos does not dispute Trooper Russolillo's statements that telephone records and additional investigation before submission of the Russolillo Affidavit showed that Tzannos was utilizing telephone numbers 617-567-6114 and 617-846-6630, and was call-forwarding calls from 617-567-6114 to 617-846-6630 during gambling hours (Russolillo Aff. ¶¶ E, I, J).

Fourth, Tzannos does not dispute Trooper Russolillo's statements that both Trooper Russolillo and Trooper Nunzio Orlando (a) had known a particular confidential informant, identified as "CI-1," for more than two years; (b) knew CI-1's true identity and home address; (c) utilized CI-1 in prior investigations; (d) had corroborated information that CI-1 had provided; (e) utilized information from CI-1 in obtaining a search warrant for 161 Salem Street, Suite 7, Medford, Massachusetts, on October 28, 2002, resulting in the seizure of illegal gambling records consistent with the information that CI-1 had provided; and (f) used information from CI-1 in the investigation that led to the gambling convictions of Anthony Bonfilio, Gregory Chenevert, and James Bonfilio

Page

on June 27, 2003 -- just two months before the date of Trooper Russolillo's affidavit (Russolillo Aff. ¶ D).

Fifth, Tzannos does not dispute Trooper Russolillo's statements about the relationship o illegal gambling businesses in the Boston area to traditional organized crime families (such as L; Cosa Nostra) and other organized crime groups (such as the Winter Hill Gang) (Russolillo Aff. ¶ B) Moreover, Tzannos does not dispute Trooper Russolillo's statement that CI-1 agreed to provide information to Troopers Russolillo and Orlando only if CI-1's identity would not be revealed (Russolillo Aff. ¶ D), and that disclosing the identity of the confidential informant would render that person susceptible to physical harm and retribution (Russolillo Aff. ¶ D).

Sixth, Tzannos does not dispute Detective Lieutenant John Tutungian's statement, in the inventory of property seized pursuant to the August 28, 2003 search warrant, that the Massachusetts State Police seized, among other things, numerous gambling records, tape recordings, and $10,200 in cash.

Finally, Tzannos concedes in his own statement in support of his motion, in attorney DeJuneas's affidavit ("DeJuneas Aff.") in support of Tzannos's motion, and in the motion itself, that -- just as Trooper Russolillo had stated in his affidavit -- Tzannos was accepting bets from numerous bettors, utilizing 617-567-6114 to accept bets, maintaining records of the bets, and tape recording action from the bettors (Tzannos Statement; DeJuneas Aff.).

Page

### Uncontested Legal Principles

Tzannos concedes, in his "Motion for *Franks* Hearing" ("Motion") that "our entire crimina justice system places great trust in a police officer who asks a court to issue a search warrant"; tha "our courts *automatically* presume that such an officer is being entirely truthful"; and tha "defendants who allege otherwise have a rather high hurdle to jump: just to obtain an evidentiary hearing, they must first make a substantial preliminary showing that an officer intentionally, or at least recklessly, made misrepresentations that were material to probable cause" (Motion at 1).

### Discussion

In his *Franks* motion, Tzannos does *not* allege that Trooper Russolillo acted "recklessly" in making the statements in the August 28, 2003 affidavit in support of the search warrant.

Rather, Tzannos claims that Trooper Russolillo "knowingly made false allegations" (Motion at 1); "fabricated the very existence of the confidential informant" (Motion at 2); made "falsehoods [that] can only be made with deliberation and forethought" (Motion at 3); engaged in "perjurious conduct" (*id.*); made "falsehoods [that] were intentional and deliberate" (Motion at 7); and "intentionally and falsely ... lied about CI-1's very existence" (Motion at 10).

The Supreme Court has explicitly held that there is "a presumption of validity with respect to the affidavit supporting the search warrant," and that "[t]o mandate an evidentiary hearing, ... [a]ffidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained." *Franks*, 438 U.S. at 171.

Tzannos has failed to comply with that requirement, and thus has not made the substantial preliminary showing that is a prerequisite to obtaining an evidentiary hearing under *Franks*. This failure by Tzannos is fatal to his motion.

Page

The Supreme Court emphasized that the rule it announced in *Franks* "has a limited scope . in regard to ... when a hearing on allegations of misstatements must be accorded." 438 U.S. at 167 The Court explained that "[t]he requirement of a substantial preliminary showing should suffice t prevent the misuse of a veracity hearing for purposes of discovery or obstruction." *Id.* at 170. A the First Circuit has observed, "evidentiary hearings on motions in criminal cases are the exception not the rule. ... *See Franks v. Delaware*, 438 U.S. 154, 155-56 ... (requiring 'substantial preliminar) showing' antecedent to evidentiary hearing on motion in criminal case)...." *United States v. Alicea*, 205 F.3d 480, 487 (1st Cir.), *cert. denied*, 531 U.S. 909 (2000).

Tzannos's allegations depend upon (a) a five-sentence written statement by Tzannos (Exhibit E to DeJuneas Aff.) and (b) a series of three- to five-sentence documents (Exhibits C, D, F-L, O, Q) euphemistically described as "affidavits."

While Tzannos formulaicly recites that he "understand[s] the obligation of an oath," he is, after all, a convicted felon who was caught illegally possessing a series of weapons, as a result of which he is seeking to avoid another felony conviction in the current case. Aside from his obvious bias and direct interest in this matter, his affidavit (a) does *not* say that the State Police obtained tapes and written records of *all* of his illegal gambling activities on August 16, 17, 20, and 25, 2003; and (b) does not explain how particular seized tapes -- which contained no external markings (other than Bates numbers later assigned by the government, during discovery) -- can be shown to relate to particular dates and specific telephone lines. Nor does the DeJuneas affidavit discuss these issues.

The other alleged "affidavits" (a) do not contain any signatures; (b) do not reveal the true names of the purported "affiants"; (c) do not indicate that they were sworn before anyone authorized by law to administer oaths; (d) do not indicate that they were submitted for the purpose of being filed

Page

in this Court (and, thus, that the alleged "affiants" understood that they were potentially subjecting themselves to federal felony prosecutions if they made false statements); and (e) all appear to have been generated by the same typewriter or computer.

Although Ms. DeJuneas utilized the pronoun "I" in paragraph 20 of her Affidavit ("I, along with Mr. Tzannos, listed [sic] to each of these tapes"), throughout her entire affidavit and motion papers, she studiously avoided saying that she had personally interviewed, or even met, the individuals who supposedly furnished the purported "affidavits." Her statement that "we obtained affidavits" (DeJuneas Aff. ¶ 16) is entirely consistent with defendant Tzannos having prepared and handed to Ms. DeJuneas the purported "affidavits," without Ms. DeJuneas ever having had any contact with "Tuna" (Exh. G) or any of the other alleged "affiants." Indeed, on page 10 of the Motion for *Franks* Hearing, Ms. DeJuneas states, "*Mr. Tzannos* has provided this Court with sworn statements from each person...." (Emphasis added.)

Even if Tzannos had submitted genuine affidavits, with the affiants' actual names and signatures, it would hardly have been surprising if the individual whom Trooper Russolillo identified as "CI-1" had denied to Tzannos that the individual had provided information to the State Police incriminating Tzannos. By definition, if the confidential informant had been willing to testify publicly, Trooper Russolillo would not have shielded the confidential informant's identity in the search warrant application. Given the connection between illegal gambling businesses and organized

Page

crime in Boston, it is understandable why someone in the position of the confidential informant would insist that his or her identity and assistance to law enforcement be concealed.[1]

In sum, Trooper Russolillo submitted an affidavit that described a particular individual (Tzannos), a particular location (381 Winthrop Street, Winthrop, Massachusetts), a particular telephone number (617-567-6114), and particular dates (August 16, 17, 20, and 25) on which illegal gambling business was transacted. Tzannos concedes that those allegations by Trooper Russolillo were, indeed, accurate. Moreover, execution of the search warrant uncovered evidence corroborating that those allegations by Trooper Russolillo were true.

Tzannos contends that Trooper Russolillo somehow divined all of this accurate information without using CI-1, and Tzannos does not even attempt to offer any explanation of why someone with the long and successful law enforcement career of Trooper Russolillo would jeopardize everything by perjuring himself, no less over a relatively low-level criminal such as Tzannos.

The unsigned, anonymous, "cookie-cutter," pseudo-"affidavits" submitted -- and presumably procured personally -- by Tzannos do not come close to meeting Tzannos's burden of making a "substantial preliminary showing" that Trooper Russolillo committed perjury. Indeed, the patent inadequacy of Tzannos's submission to this Court would be laughable if Tzannos were not making such inflammatory allegations about a law enforcement officer.

---

[1] The use of informants is, of course, a traditional and important means of detecting crime and developing the evidence necessary to prosecute criminals successfully. Confidentiality is recognized as critical to developing informants. See, e.g., Roviaro v. United States, 353 U.S. 53, 59 (1957) ("by preserving their anonymity," citizens are encouraged to communicate their knowledge of crimes to law enforcement officials and thus promote the public interest in effective law enforcement).

Page

Accordingly, Tzannos's motion should be denied.

        Respectfully submitted,

        MICHAEL J. SULLIVAN
        United States Attorney

By: _____
        MICHAEL L. TABAK
        Assistant U.S. Attorney
        Telephone: (617) 748-3100
        Date: March 1, 2005

### CERTIFICATE OF SERVICE

    This is to certify that I have this day served upon the persons listed below a copy of the foregoing document by depositing in the United States mail a copy of same in an envelope bearing sufficient postage for delivery:

Patricia A. DeJuneas, Esq.
Richard M. Egbert, Esq.
99 Summer Street - Suite 1800
Boston, MA 02210

This 1st day of March, 2005.

                                                */s/ Michael L. Tabak*
                                                Michael L. Tabak
                                                Assistant United States Attorney