# United States Court of Appeals
## For the First Circuit

---

No. 05-2689

UNITED STATES OF AMERICA,

Appellant,

v.

GREGORY F. TZANNOS, a/k/a Gregory F. Tzannas,

Defendant, Appellee.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Honorable Joseph L. Tauro, U.S. District Judge]

---

Before

Lynch and Howard, Circuit Judges,
and Stafford,* Senior District Judge.

---

Michael L. Tabak, Assistant United States Attorney, with whom Michael J. Sullivan, United States Attorney, was on brief, for appellant.
Richard M. Egbert, with whom Patricia A. DeJuneas and Law Offices of Richard M. Egbert, P.C., were on brief, for appellee.

---

August 22, 2006

---

---

* Of the Northern District of Florida, sitting by designation.

**LYNCH, Circuit Judge.**  This is the government's appeal from a district court's suppression order.

The district court suppressed evidence, seized pursuant to a state court warrant, based on the defendant's allegations that the affidavit by a state trooper in support of the warrant application contained material misrepresentations.  In essence, defendant argued, the affidavit referred to a confidential informant who did not exist.

Over the government's objections that the defendant had not made the "substantial preliminary showing" required for a hearing under Franks v. Delaware, 438 U.S. 154, 155-56 (1978), the district court convened a hearing.  The court appeared to accept the defendant's representations, and it rejected the government's request that it consider contrary information, which the government had sought to present ex parte and in camera based on its representation that doing otherwise would endanger the informant's life.  Without making specific findings under Franks, the district court granted the motion to suppress.  We reverse and remand with instructions to deny the motion to suppress.

I.

A.        The State Search Warrant Affidavit

On August 28, 2003, Massachusetts State Trooper Pasquale Russolillo submitted an application for a search warrant to a magistrate in a state district court in East Boston, Massachusetts.

-2-

Russolillo included a fourteen-page affidavit in support of the application.  The affidavit made the following assertions:

Russolillo and another state trooper knew Gregory Tzannos to be involved in the bookmaking business from information from past investigations "coupled with intelligence from other informants" as well as from the confidential informant central to this case.  In early July of 2003, Russolillo and another state trooper spoke to the confidential informant, "CI-1."  CI-1 agreed to provide information to the troopers only if his[1] identity was not revealed.

CI-1 told the troopers that he was placing illegal bets on sporting events with Gregory Tzannos via telephone.  The informant said he had placed the bets by calling (617) 567-6114 ("the 6114 line") and by speaking to Tzannos directly.  The officers subpoenaed the telephone company and discovered that that number belonged to Tzannos and that it was unpublished.

They also discovered via subpoena that calls to the 6114 line had been forwarded to a separate number, (617) 846-6630, on several days in August.  This was significant because bookmakers often used call forwarding to disguise the location of their operations.  The officers discovered that the second phone number, (617) 846-6630, was registered to a corporation, DBA: American

---

[1]    The gender of the confidential informant was unspecified; for convenience we use "he."

Eagle Purchasing Agents, at 381 Winthrop Street, Winthrop, Massachusetts. The person listed in state records as the corporation's treasurer and registered agent was Tzannos, who was also listed on the telephone bill.

Russolillo spoke to CI-1 on August 18 and was told that CI-1 had placed "several wagers" with Tzannos over the 6114 line on August 16 and 17. On August 20, another officer spoke to CI-1 and was told that CI-1 had placed another bet with Tzannos that day, again on the 6114 line. Troopers subsequently conducted surveillance at 381 Winthrop Street and, on several separate days, observed vehicles registered to a Linda Wagner; this was significant because CI-1 had told police that Tzannos had a girlfriend named "Linda."

The affidavit recounted that on August 25, 2003, CI-1 and Russolillo placed a "controlled call" to Tzannos on the 6114 line. This allegation is key to Tzannos's later _Franks_ motion. The affidavit explained that in a controlled call, the police officer dials the number, waits until the target of the investigation answers, hands the phone to the informant, and then watches as the informant speaks to the target. CI-1 told Russolillo that Tzannos was the person who answered the phone during the controlled call, and that Tzannos proceeded to give a rundown of the day's betting lines for baseball.

-4-

Russolillo's affidavit stated that CI-1 had provided information to Russolillo and other troopers in the past, and the information "has proven to be reliable and true." It said the troopers had known CI-1 for more than two years and that they knew his identity and address. The affidavit also gave extensive details on CI-1's past cooperation, stating, for example, that CI-1 had identified various bookmakers and their identities and telephone numbers, that all of the information had been corroborated by subsequent investigation, and that past information from CI-1 had led to the arrest, prosecution, and conviction of three men for gaming violations. The affidavit stated that CI-1 had also provided general intelligence information regarding other criminal matters, but that the affiant could not detail the particulars of these cases, because doing so would compromise the anonymity of the informant, making him "susceptible to physical harm and/or retribution." It explained that Russolillo had "learned that traditional organized crime families (such as La Cosa Nostra or the Mafia) and other organized crime groups (such as the Winter Hill Gang) in the Boston area have been heavily involved in illegal gaming and bookmaking and have maintained a significant degree of control over organized bookmaking operations."

B.      The State Search Warrant, the Search, and the Federal
        Indictment

The affidavit asserted that CI-1's information, combined with the officers' investigation, sufficed to create probable cause

-5-

to believe that Tzannos was violating state laws forbidding certain gaming activities, <u>see</u> Mass. Gen. Laws ch. 271, §§ 17-17A, and was doing so from the building at 381 Winthrop Street.  It sought a warrant to search that address.  The magistrate agreed and issued the warrant.  Massachusetts state police executed the warrant on August 28, 2003, and found a fully equipped gaming office. Officers seized gaming records, $10,200 in cash, and tape recorders and tapes that had been used to record conversations with customers.  In addition, police found and seized a loaded pistol, two loaded revolvers, a sawed-off shotgun, various types of ammunition, three switchblade knives, a pair of brass knuckles, and a blowgun with needles.

On June 30, 2004, a federal grand jury indicted Tzannos on charges of violating 18 U.S.C. § 922(g)(1), which prohibits possession of firearms by convicted felons.  The indictment stated that the offense "involved three to seven firearms" and that Tzannos possessed at least one of the firearms and at least one piece of ammunition "in connection with another felony offense, to wit: occupying a place for registering bets in violation of Mass. Gen. Laws[] ch. 271, § 17, a Massachusetts offense punishable by imprisonment for a term exceeding one year."

C.          The Franks Hearing and the Suppression Order

On February 15, 2005, Tzannos asked the district court to conduct a <u>Franks</u> hearing so that he could challenge "the accuracy

-6-

and truthfulness of the affidavit."  In his motion papers, Tzannos argued that the affidavit had to be untruthful because (1) Russolillo swore that the informant placed calls to the 6114 line on four particular days, August 16, 17, 20, and 25, and spoke to Tzannos on each of those days, (2) the defense identified each and every caller to that number on those days and "ha[d] documentation to back it up," and (3) each and every one of those callers had signed a statement denying under oath that he or she was the informant.  Tzannos argued that "[t]he only logical conclusion that one could possibly reach is that there was no informant, or at least that no informant did the things described in the [Russolillo] affidavit."  Thus, Tzannos argued, if it were not true that the informant made gambling-related calls to Tzannos over the 6114 line on the four days, then it was necessarily true that no informant existed and that Russolillo had lied.

Tzannos's motion was accompanied by an affidavit of defense counsel, which in turn was supported by several exhibits. Those exhibits included (1) some handwritten ledger sheets, which were seized during the execution of the search warrant at issue, (2) a transcript of one of four audiocassette tapes that were also seized during the search, and (3) signed statements from individuals that Tzannos identified, from the ledger sheets, as having called to place bets with him on the four days in question.

-7-

Tzannos focused his challenge on Russolillo's allegation that CI-1 had made a controlled call to Tzannos on August 25, 2003 on the 6114 line. Defense counsel represented that the ledger sheets show that on August 25, only two individuals, "Jerry" and "Norton," called to place bets on the 6114 line. Counsel further represented that the tape is a recording of telephone calls made to the 6114 line on August 25, 2003, and that a transcript of that tape shows that only three people, "Paulie," "Jerry," and "Norton," made gaming-related calls that day to the 6114 line. Counsel then attached signed statements from "Paulie," "Jerry," and "Norton," swearing that "[a]t no time did I cooperate with the police, nor was I a confidential informant."

In response to Tzannos's motion, the government argued that he had failed to meet "the substantial preliminary showing that is a prerequisite to obtaining an evidentiary hearing under Franks." Specifically, the government argued in its reply papers (1) that there was no evidence that the police had obtained all the tapes and written records of Tzannos's illegal gambling activities on the days in question; (2) that even if the police had seized every tape and record, "that would not guarantee (nor does Tzannos clearly assert) that those records reflected every transaction and phone call that occurred on" those dates; (3) that there was no evidence that the tape on which Tzannos heavily relies -- which had no external markings (other than a Bates number added by the

-8-

government) -- was actually a recording of <u>all</u> the calls made to him on August 25, 2003 and on the 6114 line; and (4) that even if CI-1 were mistaken about the date or phone line, "that would be an error on CI-1's part and <u>not</u> any indication of perjury by Trooper Russolillo."

The government also challenged the reliability of the signed statements from the bettors Tzannos identified, arguing, inter alia, that the statements do not reveal the true names of the purported affiants (whose names and signatures were redacted) and do not indicate that those affiants were sworn before anyone authorized by law to administer oaths. Even if the affidavits were genuine, the government argued, "it would hardly have been surprising if . . . 'CI-1' had denied to Tzannos that [he or she] had provided information to the State Police."  Finally, the government argued that Tzannos provided no reason why Russolillo would have reason to lie and no explanation for how Russolillo could have divined the detailed information set forth in his affidavit -- which Tzannos conceded, and the evidence uncovered during the execution of the search warrant confirmed, was accurate -- if CI-1 did not, in fact, exist.

In reply, Tzannos essentially reiterated his claim that he had "identified each and every person who could possibly be CI-1" and that "each and every one of these people has signed an affidavit[] denying . . . that s/he is Russolillo's informant."  He

offered in further support of this claim his own conclusory affidavit, which simply asserted that the police "seized every single paper and record from the third floor of my home"[2] and "also seized each and every audio cassette from August[] 2003, as well as all of the tape recorders I had." His affidavit also stated that he "did not draft any of the papers that were submitted to the [c]ourt on [his] behalf." His reply papers were also accompanied by a second affidavit of defense counsel, which stated:

> 7.      I personally drafted each and every one of those affidavits.
>
> . . . .
>
> 16.     I listened to the tapes produced by the prosecution. The vast majority of the tapes are blank. As for the tapes that do contain recordings, I, with assistance from Mr. Tzannos, was able to determine the dates of each tape by comparing the conversations on the tapes to the documents that were seized.
>
> 17.     I was able to determine which tapes recorded incoming calls on particular telephone numbers because the affidavits state which people called each number. For example, I know from the affidavits which people called . . . (617) 567-6114 . . . .

Neither Tzannos's affidavit nor that of his counsel stated that the records and tapes that were seized reflected every gambling-related

---

[2]      It appears that the police searched Tzannos's entire residence, not just the third floor; indeed, Russolillo's affidavit described 381 Winthrop Street as "a one family, three story, wood structure, white siding with black shutters."

-10-

transaction and phone call that occurred on the four days in question.

After discussion with the parties at a status conference on July 6, 2005, the district court granted Tzannos's motion for a Franks hearing.  The court did not articulate its reasons for granting the hearing and did not make any specific findings of fact at this time.[3]

In a memorandum filed on September 23, 2005, the government renewed its objection to the Franks hearing.  It reiterated its earlier argument that there was no evidence that Russolillo had lied.  It also explained that it could not divulge the identity of CI-1 publicly because doing so would endanger the informant's life.  It represented that it was not authorized to disclose the informant's name without permission from the Department of Justice or the state Attorney General.  The government offered instead to prove the veracity of Russolillo's affidavit and the existence of CI-1 in an ex parte, in camera

---

[3]    At the Franks hearing itself, however, the court provided a retrospective account of its reasons for granting the hearing:

> We have a record of people testifying . . . the conversations did not take place at a particular time. That is sufficient evidence to trigger a Franks hearing. It isn't like the defendant is just pulling something out of the clouds.
> We have people who have stated under oath certain facts.  And what I want to do is to have them say it on the witness stand. . . .

proceeding, in which it would offer, inter alia, testimony of Russolillo revealing the identity of CI-1.

In reply, Tzannos agreed to an in camera proceeding, but objected to the court's allowing such a proceeding to take place ex parte.    Tzannos also requested that the Franks hearing be structured as a "full evidentiary hearing," in which defense counsel would have "the opportunity to cross[-]examine the very affiant whose allegations are at issue."  Finally, Tzannos stated that it was his intention to show at the hearing, inter alia, that "as a matter of practice, he recorded each and every incoming call," and that "[a]fter a week's books were settled, he would erase the tapes and record over them."

The district court convened the Franks hearing on September 28, 2005.  At the start of the hearing, the district court announced a procedure that neither party had proposed:

> [A]ccording to the defendant's proffer
> of evidence, there are three people [who]
> spoke [to Tzannos on August 25, 2003]: Paulie,
> Jerry[,] and Norton.  So Paulie, Jerry[,] and
> Norton at the worst come in and testify that
> they are not the confidential informant.  And
> I don't have to hear from anybody claiming to
> be the confidential informant.
>       And if it turns out that I think that
> [the controlled] call was not made to [the
> 6114] line on August 25, 2003, I can determine
> that there is no basis for whatever exists and
> allow a motion to suppress, without violating
> the identity of the confidential informant.

Tzannos made no objections to the procedure; indeed, he indicated that the three individuals had already been summoned and

-12-

that they were outside the courtroom at that moment and ready to testify. The government, however, was far less enthusiastic. It raised two main objections to the procedure. First, it argued that the procedure placed it in a double bind: if one of the three individuals were, in fact, CI-1, but testified on the stand to the contrary, the government would be placed in a position where it would be forced either to knowingly elicit and condone perjurious testimony or to "out" an informant and expose him or her to mortal danger. As a corollary of that argument, the government also noted that "if one of [the three] is the informant and tells the truth, then the Court is eliciting a statement that may get the person killed," which is "not [a] procedure that the government is prepared to participate in." Second, the government argued that there was a "fundamental flaw" in the procedure, which it could not explain in open court without providing information that would necessarily divulge CI-1's identity, but which it could explain "in one sentence ex parte [and] in camera." The government stressed that "the Court would not come out with the truthful and just result if the Court follow[ed] the procedure that the Court outlined."

The court refused to hear the government's explanation ex parte and in camera. It also refused the government's original proposal, which was to provide to the court evidence of the existence and identity of the informant ex parte and in camera.

-13-

The court stated that "[t]here are two things I don't want": "one,
I don't want to do an ex parte hearing," and "two, I don't want to
know who the confidential informant is."  It also explained:

> There is nothing absolute about the
> confidential informant and confidentiality.  I
> mean, it has to be weighed under all the
> circumstances.
> I think my suggest[ed procedure] is a
> good one.  I don't even want to know who the
> confidential informant is.
> I just want to know are these three
> people going to take the stand and say they
> are not.  And if they take the stand and say
> they are not, then that is the end of it.  I
> am not going to say who is it.

The court went further.  It stated:

> [I]f it turns out that the defendant puts
> three people on the stand and the tapes verify
> that only these three people made phone calls
> and that's it, and none of the three is the
> confidential informant, that is it as far as I
> am concerned.  I don't have to hear any more.
> I will allow the motion to suppress.

To the government's argument that "[t]he issue here is not whether
the confidential informant gave somewhat incorrect or incomplete or
any other degree of defective evidence" but "whether Trooper
Russolillo lied under oath," the court stated: "I don't think I
have to find that he lied.  I can find that none of those three
people is the confidential informant and that no other calls were
made that day and that, therefore, there is no basis for whatever
it was and then I am going to suppress it."

        Unwilling to go along with the court's proposed
procedure, the government submitted a written request that the

-14-

court reconsider its rejection of the government's request to proceed ex parte and in camera. In the alternative, the government requested that the court enter an order suppressing the fruits of the search so that the procedure could be appealed.

Tzannos objected and sought to question the three individuals, whom he identified as Jerry Ahearn, Paulie DeStefano, and Joseph McParland. In the ensuing colloquy, the court said that it was willing to allow the three individuals to testify, in part so that a record could be created for the appeal. The government again objected, stating that it could not cross-examine the three individuals. It then agreed to stipulate that if the three individuals were called to testify, they would each testify that he had called Tzannos on August 25, 2003, and that he had never been a confidential informant or made a controlled call for Russolillo. The government emphasized, however, that it was making this stipulation "with the understanding that for the reasons previously explained the government cannot cross-examine these individuals to bring out the truth," and that "the government is not conceding the truth." The court then suppressed the evidence seized pursuant to the search warrant.

II.

We bypass the question of whether Tzannos made the "substantial preliminary showing" necessary to invoke a Franks hearing. Franks, 438 U.S. at 156-57. Instead, we review de novo

-15-

the district court's ultimate decision to suppress the evidence
obtained pursuant to the warrant at issue.[4]    United States v.
Dessesaure, 429 F.3d 359, 365 (1st Cir. 2005).  We also evaluate,
for abuse of discretion, the procedure the district court used at
the Franks hearing and the district court's refusal to hear, ex
parte and in camera, the government's explanation of why that
procedure was flawed.  Cf. United States v. Valerio, 48 F.3d 58, 62
(1st Cir. 1995) (noting that "it is entirely within the discretion
of the judge presented with the request to decide whether the
disclosure [of a confidential informant's identity] is necessary in
order to determine the believability of the testifying officer,"
and reviewing for abuse of discretion the trial judge's refusal to
allow an in camera hearing to probe the identity of the informant).
As always, factual findings made by a district court in connection
with a Franks hearing are reviewed for clear error.  Id.

A.        The Suppression Order

          "There is . . . a presumption of validity with respect to
the affidavit supporting the search warrant."  Franks, 438 U.S. at

---

          [4]    That the government requested the entry of the
suppression order -- after its procedural offer was rejected --
does not affect our analysis.  The district court made clear that
it intended to go forward with the procedure it devised,  and it
also made clear that if each of the three individuals identified by
Tzannos as the only callers to the 6114 line on August 25 were to
testify that he was not the informant, or if the government were to
refuse to participate in the procedure, the consequence would be
suppression.   The government's request merely allowed the court
more quickly to reach what the court had already declared to be a
foregone conclusion.

171. For this reason, a defendant must meet a high bar even to get a <u>Franks</u> hearing in the first place. In order for a warrant to be voided and the fruits of the search excluded, the defendant must meet an even more exacting standard: he must (1) show that the affiant in fact made a false statement knowingly and intentionally, or with reckless disregard for the truth, (2) make this showing by a preponderance of the evidence, and (3) show in addition that "with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause." <u>Id.</u> at 156.

Our analysis turns on the first two factors; we do not reach the third.

The alleged falsehood in the affidavit is that Trooper Russolillo fabricated the existence of a confidential informant. That Russolillo made the false statement knowingly and intelligently is shown, defendant says, by his having stated that he was present at the controlled call made by CI-1 to Tzannos on August 25, 2003 to the 6114 line.

The district court's decision to suppress the fruits of the search would be proper only if it found, by a preponderance of the evidence, that Tzannos proved three assertions. First, Tzannos must show that only "Paulie," "Jerry," and "Norton" made gaming-related calls to Tzannos on the 6114 line on August 25, 2003, and that therefore CI-1 had to be one of the three. To do

-17-

so, he must show that the audiocassette tape on which he relied was a recording of calls made to him on the 6114 line, that the recording was of calls made on August 25, 2003, that all calls made to the 6114 line on August 25 were in fact recorded on that tape, and that the transcript entered into evidence was accurate and complete. Second, even if each of these assertions were proven, it does not follow that CI-1 does not exist; Tzannos still must prove, by a preponderance of the evidence, that each of the three individuals is telling the truth in denying being CI-1 and, further, that the real CI-1 did not provide misinformation, whether inadvertently or purposefully, to Russolillo.    Third   and ultimately, Tzannos must show, by a preponderance of the evidence, that Trooper Russolillo made a false statement knowingly and intentionally, or with reckless disregard for the truth.

We begin with the first of the three assertions Tzannos must prove. Tzannos did not show that the tape on which he relied was actually of calls made to the 6114 line on August 25, 2003. The tape itself was unmarked, and nothing in the transcript supplied by Tzannos identifies what number the callers dialed or on what date they called. The only proffer Tzannos made relating the three conversations he transcribed off of that tape to the particular line and date of the controlled call were his own affidavit, two affidavits of counsel, and their accompanying exhibits. Counsel's second affidavit stated that, with Tzannos's

-18-

help, counsel determined the date of the tape by comparing the
recorded conversations to the ledgers that were seized, and
determined the line on which those conversations had taken place by
looking to the signed statements she solicited from the bettors.
Nothing in the record establishes that the bettors' statements were
truthful or accurate, or that the seized documents completely and
accurately recorded all betting-related transactions.  Indeed, what
Tzannos asserted is the ledger from August 25 stated only that
"Jerry" and "Norton" called to place bets; it made no reference to
"Paulie" or to individuals who called to discuss betting lines
without placing a bet.

        Further, Tzannos has failed to show (1) that he recorded
every gambling-related call, on every line, and on every date as a
matter of course, (2) that the four tapes identified in his
counsel's affidavit contained every call to the 6114 line that
Tzannos recorded on August 25, and (3) that the one transcript
Tzannos provided of calls allegedly made on August 25 to the 6114
line was complete and accurate.  Indeed, while Tzannos stated in
his pre-trial memorandum that he would prove at the Franks hearing
that he routinely taped every incoming call, he never made that
showing.

        Tzannos largely disproved his own argument.  He admitted
in that same pre-trial memorandum that after a week's books were
settled, it was his practice to erase the tapes and to record over

-19-

them.  He did not say on which day of the week he did so, or
whether the practice was irregular.  Most of the tapes seized
during the search were blank or unintelligible, tending to disprove
his assertion that the tapes are accurate evidence of the calls he
received.[5] He did not show that the tapes contained each and every
call made to him on the four dates in question, let alone on August
25.  In fact, defense counsel's affidavit made reference to three
other tapes, allegedly of incoming calls made by a number of other
callers "on several days, including August 25, 2003."  Tzannos did
not provide transcripts of any of these other tapes.

Nor did he prove the accuracy of the one transcript he
did  provide.    The  transcript  itself  appears  to  end  mid-
conversation,  thus  suggesting  that  either  the  transcript  was
incomplete or that the tape stopped recording in the middle of a
call.    These  inconsistencies  substantially  undercut  Tzannos's
showing.

---

[5]      Even the tape on which Tzannos largely relies appears to
have  some  technical  problems.    For  example,  according  to  the
transcript,  the  tape  has  a  two-line  conversation  between  two
unidentified individuals, in which the name "Dahlia" is mentioned:

F:    Heya.    [inaudible].    I  [inaudible].    I  ain't
[inaudible] that's bad luck.  C and Dahlia.

F2:  Dahlia.

Nothing in the record explains who took part in this conversation,
what the conversation was about, and whether the conversation was
actually only two-lines long or whether it was recorded over or cut
off.

-20-

The district court did not make any explicit findings of fact at the <u>Franks</u> hearing. Nonetheless, it must implicitly have found that Tzannos's evidence was sufficient to show, by a preponderance of the evidence, that only "Paulie," "Jerry," and "Norton," made gambling-related calls to Tzannos on the 6114 line on August 25. Given the substantial gaps in the evidence, this finding was clear error and alone provides a basis for reversal.

There are further grounds, however, for reversing the suppression order. Even if Tzannos had proven his first assertion by a preponderance of the evidence, it does not follow that he proved by a preponderance of the evidence that no confidential informant exists.

Ultimately, Tzannos must demonstrate, by a preponderance of the evidence, that the affiant, Trooper Russolillo, rather than the informant, made a false statement knowingly and intentionally, or with reckless disregard for the truth. "Allegations of negligence or innocent mistake are insufficient," <u>Franks</u>, 438 U.S. at 171, as are allegations going to show that the informant relayed misinformation to the affiant, <u>see</u> <u>id.</u> ("The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any nongovernmental informant."); <u>United States</u> v. <u>Southard</u>, 700 F.2d 1, 10 (1st Cir. 1983) ("<u>Franks</u>' requirements cannot be satisfied by a showing that an informer lied to an unsuspecting affiant, even when the lie was deliberate.").

-21-

Tzannos has not contested the accuracy of any of the substantive information provided by CI-1 to Russolillo, and has not explained how Russolillo would have obtained such detailed and accurate information if CI-1 did not exist. Nor has Tzannos made any showing of why Russolillo would have reason to lie. He thus has not met his burden of showing that Russolillo made a false statement knowingly and intentionally, or with reckless disregard for the truth. To the extent that the district court held otherwise, it committed clear error.[6] We hold that the court erred in suppressing the evidence.

B.        Problems with the District Court's Procedure at the Franks Hearing

The government also appeals (1) the district court's refusal to hear the government's one-line explanation of why the procedure that the court devised for the Franks hearing was, in the government's view, flawed, and (2) the court's ultimate decision to go forward with the hearing without listening to that explanation.[7]

_____

        [6]    The district court stated: "I don't think I have to find that [Russolillo] lied. I can find that none of those three people is the confidential informant and that no other calls were made that day and that, therefore, there is no basis for whatever it was and then I am going to suppress it." The court did not state that if Tzannos did not show that Russolillo lied, then he at least needed to show that Russolillo acted with a reckless disregard for truth.

        [7]    The government does not appeal from the court's rejection of its initial proposal to have an evidentiary hearing, ex parte and in camera, in which it would, inter alia, call Russolillo to testify to the truth of his affidavit and to identify CI-1.

-22-

At the Franks hearing, when the government asked to explain to the court, in one sentence, what the government argued was a "fundamental flaw" in the court's analysis, the court refused to hear the explanation ex parte and in camera, despite the government's entreaties that the way the court structured the proceeding would jeopardize the life of the informant and lead to a miscarriage of justice. The court in essence shifted the burden of proof to the government: short of proving CI-1's existence, there was no way the government could disprove the defendant's allegations.

The court's position effectively eliminated the privilege the government has under Roviaro v. United States, 353 U.S. 53 (1957),[8] to protect the identity of confidential informants. The court's refusal to hear the government's explanation and its insistence on going forward with the procedure of its own devising were thus an abuse of discretion.

In oft-quoted language, Roviaro stated:

> What is usually referred to as the informer's
> privilege is in reality the Government's
> privilege to withhold from disclosure the
> identity of persons who furnish information of
> violations of law to officers charged with
> enforcement of that law. The purpose of the
> privilege is the furtherance and protection of

---

[8]    Unlike Roviaro, the issue here is not the suppression of the informant's testimony, but rather the suppression of the fruits of the search pursuant to a warrant issued by a state court judge and presumed to be valid.

-23-

the public interest in effective law
enforcement.

Id. at 59 (citations omitted).  The privilege, while significant,
is not absolute.  Thus, "[w]here the disclosure of an informer's
identity, or of the contents of his communication, is relevant and
helpful to the defense of an accused, or is essential to a fair
determination of a cause, the privilege must give way."  Id. at 60-
61; see also id. at 60 (holding that "where the disclosure of the
contents of a communication will not tend to reveal the identity of
an informer, the contents are not privileged," and that
"[l]ikewise, once the identity of the informer has been disclosed
to those who would have cause to resent the communication, the
privilege is no longer applicable").

Ultimately, Roviaro requires a "balancing [of] the public
interest in protecting the flow of information against the
individual's right to prepare his defense."  Id. at 62.  "Whether
a proper balance . . . [requires] nondisclosure . . . must depend
on the particular circumstances of each case, taking into
consideration the crime charged, the possible defenses, the
possible significance of the informer's testimony, and other
relevant factors."  Id.; see also McCray v. Illinois, 386 U.S. 300,
311 (1967).  This court has stated that "when the government
informant is not an actual participant or a witness to the offense,
disclosure is required only in those exceptional cases where the
defendant can point to some concrete circumstance that might

-24-

justify overriding both the public interest in encouraging the flow
of information, and the informant's private interest in his or her
own safety."  United States v. Martinez, 922 F.2d 914, 921 (1st
Cir. 1991).

      Tzannos, as the party seeking disclosure, bore the burden
of persuasion in this analysis.  See United States v. Gomez-Genao,
267 F.3d 1, 2 (1st Cir. 2001); see also United States v. Perez, 299
F.3d 1, 3-4 (1st Cir. 2002) ("[T]he law places the burden squarely
on the party seeking disclosure (typically, the defendant) to
demonstrate that knowledge of the identity of a confidential
informant is vital to the proper preparation and presentation of
his case.").  This court has described this burden as a "heavy"
one.  United States v. Robinson, 144 F.3d 104, 106 (1st Cir. 1998).
The government argues that Tzannos has failed to meet this burden
and that the court abused its discretion in implicitly holding
otherwise.

      For his part, Tzannos offers no arguments as to why
disclosure of the confidential informant's identity was warranted
in this case.  Instead, Tzannos puts all of his stock in two
arguments, of which we readily dispose.  His first argument is that
he never asked the court to order the disclosure of CI-1's identity
and thus Roviaro does not even apply.  The court's procedure,
however, placed the government in a Catch-22: it could not
participate in the Franks hearing without risking exposing its

-25-

informant (or suborning perjury), and it could not explain to the court, beyond the other arguments it made, why the court's analysis was flawed without effectively disclosing the identity of its informant. That the court did not require the government to say the actual name of the informant is of little significance; it was requiring the government to provide information that would, for all practical purposes, divulge the informant's identity. "The privilege identified in Roviaro protects more than just the name of the informant and extends to information that would tend to reveal the identity of the informant." United States v. Napier, 436 F.3d 1133, 1136 (9th Cir. 2006).

Tzannos's second argument as to why Roviaro does not apply is that "if one of the three would-be witnesses turned out to be CI-1, then that witness had voluntarily put himself in the position of having to admit being an informant." Tzannos's argument rests on mistaken premises: as we noted above, the Roviaro privilege does not belong to the informant, but rather to the government. Thus, even assuming that CI-1 was one of the three individuals identified by Tzannos, so long as that individual has not voluntarily disclosed his status as an informant to the defendant, the government may still invoke its "privilege to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law." Roviaro, 353 U.S. at 59.

-26-

The government emphatically argued that the particular circumstances of this case warranted protection of the informant's identity.  It repeatedly stressed during the course of the Franks hearing and in its filings that CI-1 would likely be murdered if his identity were publicly disclosed.   It also pointed to Russolillo's affidavit, which stated that "traditional organized crime families (such as La Cosa Nostra or the Mafia) and other organized crime groups (such as the Winter Hill Gang) in the Boston area have been heavily involved in illegal gaming and bookmaking and have maintained a significant degree of control over organized bookmaking operations," and that "compromis[ing] the anonymity of the confidential reliable informant [would] mak[e] him/her susceptible to physical harm and/or retribution."

Against the government's interest in protecting the identity of the informant, we must balance "the fundamental requirements of fairness" and Tzannos's right to prepare his defense.  Roviaro, 353 U.S. at 60.  Generally, the defendant's competing interests are of a lesser magnitude at the suppression stage than at trial.  See United States v. Jackson, 918 F.2d 236, 240 (1st Cir. 1990) (citing United States v. Raddatz, 447 U.S. 667, 679 (1980)); cf. McCray, 386 U.S. at 312 ("[T]he Court in the exercise of its power to formulate evidentiary rules for federal criminal cases has consistently declined to hold that an informer's identity need always be disclosed in a federal criminal trial, let

-27-

alone in a preliminary hearing to determine probable cause for an arrest or search."). These interests are especially weak here, where the informant is not "the sole participant, other than the accused, in the transaction charged," Robinson, 144 F.3d at 106; was not "the only witness in a position to amplify or contradict the testimony of government witnesses," Roviaro, 353 U.S. at 64; and in fact had no involvement whatsoever in the crime charged -- to wit, possession of firearms and ammunition by a felon, see United States v. Gray, 47 F.3d 1359, 1365 (4th Cir. 1995); United States v. Bender, 5 F.3d 267, 270 (7th Cir. 1993). Nor has Tzannos shown that the disclosure of the informant's identity would allow him to meet his burden under Franks.

Tzannos has failed to show why disclosure of the identity of CI-1 is warranted in the circumstances of this case. See United States v. Brown, 3 F.3d 673, 679 (3d Cir. 1993) ("A defendant who merely hopes (without showing a likelihood) that disclosure will lead to evidence supporting suppression has not shown that disclosure will be 'relevant and helpful to the defense . . . or is essential to a fair determination[.]'" (omission in original) (quoting Roviaro, 353 U.S. at 60-61)); United States v. Barone, 787 F.2d 811, 814-15 (2d Cir. 1986). The district court's decision to go forward with its own procedure and to refuse to hear the government's ex parte, in camera explanation of why that procedure was problematic was an abuse of discretion.

-28-

III.

We <u>reverse</u> the district court's order suppressing the evidence and <u>remand</u> with instructions to deny the motion to suppress.