UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>   v.<br><br>GREGORY F. TZANNOS,<br>  a/k/a GREGORY F. TZANNAS | Criminal No. 04-10193 |

### DEFENDANT GREGORY TZANNOS's SENTENCING MEMORANDUM

Defendant Gregory Tzannos respectfully submits this sentencing memorandum to aid this Honorable Court in fashioning an appropriate sentence. As set forth in more detail below, Mr. Tzannos was originally charged in the East Boston District Court. But to Mr. Tzannos's great detriment, after his counsel and the assistant district attorney struck an agreement calling for a suspended sentence and probation, the United States Attorney's Office intervened and Mr. Tzannos was indicted in this Court, where he faces the very real possibility of a substantial sentence of incarceration. Mr. Tzannos respectfully requests that this Court consider the great disparity between the sentence the East Boston District Court was sure to impose and what the United States Sentencing Guidelines call for, and asks that a reasonable sentence of probation be imposed.

### I.    BACKGROUND AND PROCEDURAL HISTORY

The instant case was originally – and should have remained – a state district court case. On August 29, 2003, Mr. Tzannos was charged in the East Boston District Court with weapons offenses (including the firearms at issue here) and other offenses. All charges stemmed from the execution of a search warrant which Massachusetts State

1

Trooper Pasquale Russolillo obtained from a magistrate of the East Boston District Court on August 28, 2003.

Shortly after Mr. Tzannos was charged in the East Boston District Court, his case was referred to Suffolk Superior Court for indictment. The Superior Court assistant district attorney, however, declined to seek an indictment and the case was sent back to the East Boston District Court for ultimate resolution.

Attorney Michael Cioffi represented Mr. Tzannos in the state proceedings. *See* Exh. A. In May or June of 2004, he negotiated a plea bargain with the District Court Assistant District Attorney. *See id.* In light of Mr. Tzannos's record (his last conviction was in 1983 on an operating under the influence charge), the assistant district attorney agreed that he would not seek a sentence of incarceration. *See id.* Mr. Cioffi and the assistant district attorney agreed to a suspended sentence and two years probation. *See id.*

Mr. Tzannos was scheduled to change his plea on July 6, 2004. *See id.* But shortly after Mr. Cioffi struck the agreement with the assistant district attorney for what was, in essence, probation, and just days before the scheduled change of plea, the United States Attorney's Office sought and obtained an indictment in this Court. On July 21, 2004, Mr. Tzannos was arraigned in this Court on a charge of being a felon in possession of a firearm. The felony upon which the charge is predicated is a 39 year old conviction for larceny over $100.

Because of the federal indictment, the East Boston District Court dismissed the charges against Mr. Tzannos on August 30, 2004. *See id.*

During the pendency of the instant case, Mr. Tzannos filed a Motion for a *Franks* Hearing, alleging that Trooper Russolillo intentionally lied about material facts in his

2

search warrant affidavit. In short, Mr. Tzannos presented this Court (Tauro, J.) with evidence showing that Trooper Russolillo intentionally fabricated the existence of a confidential informant. Judge Tauro granted Mr. Tzannos's *Franks* motion and scheduled an evidentiary hearing. At that hearing, Mr. Tzannos was prepared to go forward with witnesses and exhibits. The prosecution, however, insisted that Judge Tauro permit it to answer Mr. Tzannos's allegations in an *ex parte, in camera* proceeding. After Judge Tauro announced his decision that the *Franks* hearing would be an adversarial one in open court, the prosecution refused to participate and asked the Court to suppress the evidence seized pursuant to the search warrant so it could appeal. On appeal, the First Circuit reversed Judge Tauro's decision to grant the Motion for a *Franks* Hearing, concluding that Mr. Tzannos did not prove his allegations by a preponderance of the evidence (a standard which the First Circuit held applicable even though there had never been a *Franks* hearing in light of the prosecution's refusal to participate, and as such, Mr. Tzannos never had the opportunity to present his witnesses and evidence).

On January 7, 2007, Mr. Tzannos pled guilty to the one-count indictment,[1] and is now before this Court for sentencing.

## II. DETERMINING A SENTENCE POST-*BOOKER*

In the post-*Booker* world of sentencing, the United States Sentencing Guidelines ("Guidelines") "are merely advisory, which means that a district court has considerable leeway to impose a sentence that falls outside of the range suggested by the guidelines." *United States v. Robinson*, 433 F.3d 31, 35 (1st Cir. 2005). Now, courts are free "to

---

[1] The indictment, which preceded *Booker*, also set forth allegations regarding sentencing enhancements. Mr. Tzannos did not plead guilty regarding to those allegations.

3

impose non-guidelines sentences that override the guidelines, subject only to the ultimate requirement of reasonableness." *United States v. Jiminez-Beltre*, 440 F.3d 514, 518 (1st Cir. 2006) (en banc).

In fashioning an appropriate sentence for Mr. Tzannos, this Court should first look to the Guidelines. *Id.* (explaining that Guidelines "continue to be an important consideration in sentencing that should be addressed in the first instance by the sentencing judge.") Here, as the PSR indicates, Mr. Tzannos's Total Offense Level is 13, and the corresponding range of sentences is twelve to eighteen months. The Guidelines sentencing range, however, is merely "the starting point" of this Court's sentencing analysis. Mr. Tzannos "is free to adduce reasons and facts to support" his request for a below-Guidelines sentence. *United States v. Saez*, 444 F.3d 15, 17 (1st Cir. 2006).

After calculating the applicable Guidelines, this Court must next consider "the sentencing factors set out in 18 U.S.C. § 3553(a), along with any other relevant considerations." *United States v. Dixon*, 449 F.3d 194, 204 (1st Cir. 2006). At this stage, this Court may consider factors that were previously discouraged or forbidden under the mandatory Guidelines. *See United States v. Smith*, 445 F.3d 1, 5 (1st Cir. 2006). For example, this Court may now consider "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct," the nature of Mr. Tzannos's offense, and his personal circumstances and characteristics.

Finally, this Court must consider whether the § 3553(a) factors weigh in favor of a sentence below that contemplated by the Guidelines. *See United States v. Wallace*, 461 F.3d 15, 32 (1st Cir. 2006). "The goal is to fashion `a sentence sufficient, but not greater

4

than necessary' for the achievement of the legitimate objectives of sentencing." *Dixon*, 449 F.3d at 203, *citing* 18 U.S.C. § 3553(a). Those objectives include promoting respect for the law, providing just punishment, deterrence, protecting the public, and providing a defendant with medical, educational, and vocational opportunities. 18 U.S.C. § 3553(a). Section 3553(a) also provides that the sentence shall be "sufficient, but not greater than necessary" to fulfill these objections.

To justify a below-Guidelines sentence, Mr. Tzannos need not show that his case is "extraordinary." *United States v. Rivera*, 448 F.3d 82, 85 (1st Cir. 2006). Indeed, this Court "is not bound to impose a sentence within the range the Guidelines recommend, of course, and may depart from it if it reasonably concludes that the other § 3553 factors warrant such a departure." *Robinson*, 433 F.3d at 35.

### III. THE SECTION 3553 FACTORS WEIGH IN FAVOR OF A PROBATIONARY SENTENCE.

In accordance with 18 U.S.C. § 3553(a)(6), this Court, "in determining the particular sentence to be imposed, shall consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct…."

Moreover, this Court must also consider other Section 3553(a) factors, including:

- The nature and circumstances of Mr. Tzannos's offense;
- Mr. Tzannos's personal history and characteristics;
- Mr. Tzannos's need for training, education, and services; and
- The need for the sentence imposed, in light of:
    - The seriousness of Mr. Tzannos's offenses;
    - Deterrence considerations;
    - Concerns of recidivism; and
    - The need to protect the public from Mr. Tzannos.

As set forth below, these factors weigh against an incarcerated sentence and in favor of a term of probation:

**A. There Is A Great Disparity Between the Sentence Mr. Tzannos Was Likely To Receive In The East Boston District Court And The Guidelines.**

In recent years, the overlap between state and federal criminal cases has become more prevalent. The overlap stems from the recent "federalization of criminal law," where defendants are subject to both state and federal prosecution for the same conduct. *United States v. Brennan*, 468 F.Supp.2d 400, 406 (E.D.N.Y. 2007), *quoting* Christine Demaso, Note, *Advisory Sentencing and the Federalization of Crime: Should Federal Sentencing Judges Consider the Disparity Between State and Federal Sentences Under Booker*? 106 Columbia L.Rev. 2095, 2119 (2006). That overlap has led to a great disparity between the sentences that state court defendants face versus that which federal court defendants face, federal sentences generally being much longer. *See Brennan* at 407. "The continuing federalization of criminal law increases the frequency with which federal sentencing disparities occur.…" *United States v. Snyder*, 136 F.3d 65, 70 (1st Cir. 1998).

Prior to *Booker*, this Circuit (and others) held that the Guidelines precluded a sentencing court from granting a downward departure based on the disparity between state and federal sentences. *See id.* at 68 (citing cases). But after *Booker*, courts have begun to consider the disparity when fashioning a sentence for a federal defendant. *See Brennan, supra; see also United States v. Mapp*, 2007 WL 485513 (E.D. Mich. Feb. 9, 2007)(in sentencing defendant convicted of being a felon in possession of a firearm, sentencing court took into consideration that a state defendant facing similar charge

6

would receive a significantly lower sentence); *United States v. Wachowiak*, 412 F.Supp.2d 958, 965 (E.D. Wisc. 2006)(although sentencing court did not take federal/state sentencing disparity into account in that particular case, judge "assumed that in an appropriate case [he] possessed the discretion to do so."); *United States v. Lucania*, 379 F.Supp.2d 288, (E.D.N.Y. 2005)(announcing that it planned to consider a higher-than Guidelines sentence, court considered that "[a] conviction for similar conduct in a New York state court would likely earn the defendants a substantially more severe sentence than that called for by the Guidelines.").[2]

As for this Circuit, it recently left open the question "whether federal-state sentencing disparities may be considered under the post-*Booker* advisory guidelines." *United States v. Wilkerson*, 411 F.3d 1, 10 n. ** (1st Cir. 2005). In remanding Wilkerson's case for resentencing, the First Circuit reasoned that he had shown a "reasonable indication that the district judge might well have reached a different result under advisory guidelines." *Id.* at 10 (citation omitted). That "reasonable indication" stemmed from Judge Wolf's comments at sentencing – he had "repeatedly expressed his concern about disparate treatment between federal and state court sentences in similar cases…." *Id.* Judge Wolf could not, however, consider that disparity at the time he sentenced Wilkerson because *Booker* had not yet been decided and *Snyder* was the law of this Circuit. *See Snyder*, 136 F.3d at 69.

Courts that have recently considered federal/state sentencing disparities after *Booker* have started their analysis with 18 U.S.C. § 3553(a)(6), which mandates that

---

[2] Some courts have held that, even post-*Booker*, a sentencing court may not consider the federal/state sentence disparity. *See, e.g., United States v. Jeremiah*, 446 F.3d 805, 8-7-8-8 (8th Cir. 2006); *United States v. Clark*, 434 F.3d 684, 687-88 (4th Cir.), *cert. den.*, __ U.S. __, 126 S.Ct. 2054 (2006.

7

"[t]he court, in determining the particular sentence to be imposed, shall consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct…." *See, e.g., Brennan*, 468 F.Supp.2d at 407; *Lucania*, 379 F.Supp.2d at 296. As the *Brennan* court noted, the disparity contemplated by Section 3553(a)(6) "has usually been interpreted to apply horizontally to comparisons among federal defendants." 468 F.Supp.2d at 407. But, as *Brennan* also noted, "section 3553(a)(6) can also be interpreted to require consideration of vertical disparities between local state and federal sentences." *Id.* Such an interpretation makes good sense and policy, for "consideration of the disparity between state and federal sentences … [would] help alleviate … the concern that federal courts are overwhelmed with matters that can and should be tried in the states." *Id.* at 406 (brackets in original; citation omitted).

Considering the length of a federal sentence against its state counterpart is appropriate for other reasons as well. For one, "[c]riminal law and sentences in the past and today have been crafted by the state not the federal government[.]" *Id.* at 407. Also, "federal sentences have had little impact on most crimes." *Id. Brennan* goes on to explain:

> From the point of view of the impact on sentencing on specific and general deterrence and on reducing recidivism rates, state vertical coordination is more important that national-horizontal uniformity. The public and criminals generally consider the local federal and state courts as part of a single protective institution. Too great a disparity between state and federal prosecution and sentencing decisions will be seen by the public as creating unjustified disparities.

*Id.* at 407.

Moreover, by considering the differences between state and federal sentences, sentencing courts "may also moderate the power of prosecutors to whipsaw defendants – federal prosecutors intervening in state matters, and state prosecutors threatening deferral to federal prosecutions with the prospect of higher sentences." *Id.* at 407-08.

Whether a sentencing court should consider a federal/state sentencing disparity in a particular case is a fact-specific determination. *See Mapp*, 2007 WL 485513 at *7. The facts of Mr. Tzannos's case – and its state predecessor – support consideration of the disparity in this Court's present sentencing determination. Indeed, this is not a case where a federal defendant <u>could have been</u> charged in state court and the sentence a state court might impose is a matter of pure conjecture. Rather, the case against Mr. Tzannos was actually brought in state court, where it was prosecuted for a year, and was only dismissed because of the federal indictment. Moreover, Mr. Tzannos's attorney had already struck a deal with the assistant district attorney, and Mr. Tzannos's change of plea and sentencing had already been scheduled. Without a doubt, prior to his indictment in this Court, Mr. Tzannos faced what was, in essence, a term of probation

In light of the disparity between the sentence Mr. Tzannos would have surely received in the East Boston District Court and the Guidelines sentence he now faces, a probationary sentence is appropriate.

**B. The Nature of the Offense Also Weighs in Favor of Probation.**

Mr. Tzannos pled guilty to a violation of 18 U.S.C. § 922(g)(1), *i.e.*, being a felon in possession of a firearm. Unlike many defendants convicted of the same offense, however, Mr. Tzannos's underlying felony dates back decades: the predicate offense is a 1968 conviction for larceny over $100, a nonviolent crime. While he has no doubt pled

9

guilty to a serious offense, the length of time between the underlying felony and the instant offense weighs heavily against a sentence in the Guidelines range.

### C. Mr. Tzannos's Personal Circumstances and Characteristics Weigh In Favor of Probation.

Mr. Tzannos is 60 years old. Although he has a criminal record, no offense is recent enough to merit an increase in his Criminal History. In fact, his last conviction was more than twenty years ago, when he pled guilty to operating under the influence and received a suspended sentence. Prior to that, his most recent conviction was the larceny charge upon which the felon in possession charge is based.

Mr. Tzannos's brother remarks that Mr. Tzannos "is artistic, intelligent, generous and talented…." PSR, Para. 62. Mr. Tzannos is indeed artistic and talented. As the photographs in B show, Mr. Tzannos creates and builds model castles. The photographs plainly show that his work is impressive, creative, and finely detailed. Although he is currently unemployed, Mr. Tzannos has had success in selling his creations. He is in the process of creating a website to garner more customers and to build his business.

Mr. Tzannos's background is impressive in other ways as well, in particular, by his devotion and commitment to his family and friends. He is married to Linda Wagner. They have been married for five years, but have been in a committed relationship for nearly thirty years. He has a daughter, age 37, and a stepdaughter, age 38, and a granddaughter, Electra, who is eleven.

Mr. Tzannos is very close to his wife, children, and entire family. Ms. Wagner describes Mr. Tzannos "as a very caring person" who is "'a rock' for his daughter and stepdaughter, always providing them with support when they need it." PSR, Para. 58. Mr. Tzannos's brother seconds her opinion of Mr. Tzannos, saying that Mr. Tzannos "is

10

always looking out for his family, including his wife, daughter, granddaughter, and parents…." PSR, Para. 62.  In a letter to the Court, Ms. Wagner says, "I realize being married does not qualify for impartiality, but as a life partner for twenty five years, I do have an accurate account of another person.  Adjectives are superficial, but the value of another sits deep and I must make it clear that I feel a good man deserves empathy.  Numerous charities, kindnesses and unsolicited help are all part of his awarenesses.  He is a very precious and special person to so many.  He is thoughtful, generous and decent…." Exh. C.

Deborah Jones, Mr. Tzannos's sister-in-law, wrote a letter in support of Mr. Tzannos.  She, like the others, explains that Mr. Tzannos is a devoted and beloved family man.  She writes,

> I have known Greg Tzannos for over 20 years as a wonderful friend, brother-in-law and beloved Uncle to our daughters.  His sense of joy in his family is unlike any other I have ever experienced.  My children speak of his sense of humor, his love of food and his creative spirit constantly.  As an example, a few years ago he vacationed with my sister in Rome and hid small prizes for our daughters around the city and made a detailed treasure map.  When we vacationed in Rome 6 months later our girls followed his map and found all of the treasures he had hidden.  Both girls came home and wrote school papers and took photographs to share that story.  Years later they still talk about it.  A month ago, we ate at the famous Colombia Restaurant in Ybor City.  Our daughters loved it and immediately thought of their Uncle and bought him handmade cigars, Cuban coffee and a story about the history of this famous restaurant.  They wrote him a letter inviting him to come down and see us so they could show it to him.  He never forgets them and they never forget him.
>
> Greg's daughter, stepdaughter and grandbabies love to be with him and are showered in love and affection as only a 'nonno' can provide.  My elderly mother hugs him before her own children.  When my husband was laid off Greg

11

> was on the phone offering his help, when my mother was hospitalized for months he went with my sister every day to visit her, he visited me in the hospital when our babies were born. I truly believe the measure of a man is the size of his heart. This man has been the voice of kindness to my family and has shown our children what a big heart he has.

Exh. D. Ms. Jones concludes, "Please, your honor, consider in this sentencing the good and kind man Gregory Tzannos has proven himself to be. His wife, daughter, stepdaughter, granddaughters, nieces and family love him and need his strength and kindness in our lives." *Id.*

Susan Fenn also writes of Mr. Tzannos's love for his family, saying "Mr. Tzannos always seeks out the positive side of situations and has helped many family members and friends because of this thinking. He is truly a man who protects his family, always putting them first. I truly believe Greg would give up his life for them if the occasion called for such." Exh. E.

Family friend Anne-Marie Petricone writes a particularly poignant story which exemplifies Mr. Tzannos's kindness and generosity of spirit:

> Due to some personal reasons in my life, a couple of years ago I found myself raising my 6 year old Grandson. He was a very scared and confused little boy, one who had no trust in anyone. The first time Greg met my Grandson (knowing all the details of his life) he greeted him with a big hug, tears in his own eyes and then proceeded to bend down, as to be his height level and talk with him. I was in total shock to see how my Grandson was responding to Greg. At first he was very shy but within a couple of minutes my Grandson was talking and laughing, something he hadn't done in awhile. Before the night was over, my Grandson was referring to Greg as "his best friend." When Christmas came along, Greg spoiled my Grandson with toys and then the two of them sat on the floor and played with them. Every time I talk with Greg he always asks how his "little Buddy" is doing. As for my Grandson, he is now doing great and loves every chance he gets to see his

> "Uncle Greg." Your Honor, I wish you could see his eyes light up when he does see Greg. I believe we can learn so much as adults as others through the eyes of a child.

Exh. F.

Ms. Petricone's daughter, Dawn-Marie Costarelli, explains the circumstances which led to her son living with Ms. Petricone, and how Mr. Tzannos helped her during a very difficult and painful period in her life:

> …I was 28 years old and addicted to crack cocaine. I lost everything, including my only child, my son Gino. I had to give custody of my son over to my mother.
>
> When Greg heard of what was going on, he didn't turn his back on me like so many other people had. Instead, he offered me his friendship. He helped me to see that there was more to life than drugs. That drugs would not only destroy everything I knew and take away everything and everyone I loved away from me, not just my son, but eventually that they would take my life.
>
> He helped me to find the courage to go into a detox center and get help for myself, to get myself clean. I am now happy and very proud to say that thanks to him believing in me, I now have 15 months clean, and I am now back in my son's life.
>
> After having 15 months being clean, I sill have an occasional day here or there when the demons try to break me, but I know that ANY time, day or night I can call Greg and he is always there to help me through.
>
> Your Honor, it is because of Greg's belief in me and commitment to helping me, that I am proud to call Gregory Tzannos my "UNCLE GREG"!

Exh. G.

Mr. Tzannos's friends all describe him as a gentleman with great character. Mr. Cioffi, Mr. Tzannos's lawyer in the previous state court case, writes that he "has known

13

Mr. Tzannos for years, professionally and socially. He is impeccably mannered, soft-spoken and always a classic gentleman. He has a mature presence as well as personality and conducts himself with great integrity." Exh. H.  Laura and Gary Lopez write of their similar opinion: "Gregory is a true gentleman in every sense of the word. All ways a friend to count on when ever you needed him. In short we cannot say enough about his great character as a person. His integrity and loyalty as a friend." Exh. I.  His physician, Dr. Rosario Scandura, also writes of Mr. Tzannos's many good qualities: "I have known him for many years to be a person of integrity. Greg has been under my professional care many times and I have found him to be responsible, as well as a dedicated family man. He has also been a good friend personally, with honor and respect and a generous nature." Exh. J.  Friend Thomas Zazzara writes that Mr. Tzannos is "a true gentleman who has always conducted himself with dignity and grace. He commands respect from those who know him best and has never refused help to anyone in need. He is calm and humble, never overreacting. There is absolutely nothing cruel or violent in his nature." Exh. K.

    Mr. Tzannos has also contributed to charitable organizations. As indicated in the PSR, over the years, Mr. Tzannos regularly contributed to the Wang Center for the Performing Arts. Steve Crampton, president of Champion's Choice, explains that his company sponsors and assists many charitable endeavors, and that Mr. Tzannos "has provided us with both monetary and man hour contributions in various charitable causes over the past 5 years." Exh. L.  Mr Crampton goes on to say, "I have personally known Mr. Tzannos for the past 25 years and knew that if I called upon him for help in our charitable endeavors he would be willing to lend a helping hand or make a generous

14

donation. He has always been more than willing to help in any way necessary and has assisted in specific causes such as Pancreatic Cancer, Breast Cancer, Wilmington Pop Warner, Wilmington Youth Soccer, and many local hardship fundraisers. Mr. Tzannos is not only more than willing to help but offers help in a sincere way, offering advice and ideas to help maximize fundraising efforts." Exh. L. Tom Convery, who works for the Make-A-Wish Foundation, similarly writes of Mr. Tzannos's civic-mindedness and generosity: "As a local Make-A-Wish Representative for the North Shore I would like to sincerely express my gratitude for the continued support received from Mr. Gregory Tzannos. He has always been willing to help in making donations for various Make-A-Wish events." Exh. M.

### D. An Incarcerated Sentence Is Not Necessary To Deter Mr. Tzannos From Future Criminal Conduct.

In light of Mr. Tzannos's age and distant criminal record, there is little chance of recidivism. To be sure, he has been on supervised release since July, 2004, and has fully abided by all conditions imposed upon him.

### E. There Is No Need To Protect The Public From Mr. Tzannos

Mr. Tzannos has never been convicted of a violent crime, and since there is little chance of him committing any future crimes, there is no need to protect the public from him.

### F. Mr. Tzannos Does Not Need Training Or Medical Care.

As the PSR indicates, Mr. Tzannos is in good health, and therefore, incarceration will not provide him with access to needed medical care. Moreover, in light of his age, he has no need for educational or vocational training.

**CONCLUSION**

In light of the relevant circumstances, a sentence of probation is "sufficient, but not greater than necessary" to achieve the legitimate objectives of sentencing. As such, Defendant Gregory Tzannos submits that a non-Guidelines sentence of probation is appropriate.

>Respectfully submitted,
>Gregory Tzannos
>By his attorneys,
>
>/s/ Patricia A. DeJuneas
>Patricia A. DeJuneas, BBO # 652997
>Richard M. Egbert, BBO # 151800
>Law Office of Richard M. Egbert, P.C.
>99 Summer Street, Suite 1800
>Boston, MA 02110
>(617) 737-8222

**CERTIFICATE OF SERVICE**

I, Patricia A. DeJuneas, hereby certify that I electronically filed Defendant Gregory Tzannos's Sentencing Memorandum and that it will be sent to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants this 6th day of April, 2007.

>/s/ Patricia A. DeJuneas

# EXHIBITS FILED SEPARATELY