UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) Crim. No. 04-10193-DPW |
| | ) |
| v. | ) |
| | ) |
| GREGORY TZANNOS, | ) |
|     Defendant. | ) |

GOVERNMENT'S SENTENCING MEMORANDUM

The government respectfully submits this memorandum in response to the sentencing memorandum ("Br.") submitted on April 6, 2007 by defendant Gregory Tzannos.[1]

Tzannos awaits sentencing for having violated 18 U.S.C. § 922(g)(1) by being a previously convicted felon who, on August 28, 2003, unlawfully possessed three firearms -- namely, a loaded Raven .25 caliber semiautomatic handgun, a loaded Colt .38 caliber special revolver, and a New Baker double-barreled shotgun, all of which were operable -- as well as more than 50 rounds of ammunition, all of which had traveled across state lines.

As set forth in the plea agreement in this case, the parties agree that the offense level is 16 (*see* U.S.S.G. §§ 2K2.1(a)(6), 2K2.1(b)(1)(A)); it should be reduced by 3 levels pursuant to U.S.S.G. §§ 3E1.1(a) and 3E1.1(b); and the defendant's Criminal History Category is I. That yields a Guidelines range of 12 to 18 months imprisonment, a fine range $3,000 to $30,000, and a supervised release range of 2 to 3 years.

---

[1] With regard to item #10 in the Amended Procedural Order re: Sentencing Hearing, the government will not move for a departure from the applicable guideline range or for a non guideline sentence. The government is not aware of any factual issues that would require an evidentiary hearing.

For the reasons set forth herein, the government recommends a sentence of (a) incarceration for 15 months, (b) a fine of $15,000, (c) supervised release for three years, and (d) a mandatory special assessment of $100.

## I. <u>Defendant Tzannos Is Not A Victim</u>

In his sentencing memorandum, defendant Tzannos acts as if he is a victim: "The instant case ... should have remained a state district court case." (Br. 1). The United States Attorney's decision to prosecute Tzannos worked "to Mr. Tzannos's great detriment." (Br. 1). "Without a doubt, prior to his indictment in this Court, Mr. Tzannos faced what was, in essence, a term of probation" in state court. (Br. 9).

Tzannos also says: "During the pendency of the instant case, Mr. Tzannos ... alleg[ed] that Trooper Russolillo intentionally lied about material facts in his search warrant affidavit. ... Tzannos presented ... evidence showing that Trooper Russolillo intentionally fabricated the existence of a confidential informant. ... Tzannos was prepared to go forward with witnesses and exhibits" but "never had the opportunity to present his witnesses and evidence." (Br. 2-3).

However, Tzannos is not a victim, and this federal prosecution is entirely appropriate. As the First Circuit has recognized, "[A] previously convicted felon, unlawfully possessing a gun, *ipso facto*, reveals a willingness to break the law again, perhaps using the gun when doing so. Moreover, legislators, when enacting the felon-in-possession statute, repeatedly referred to the danger that a gun, in the hands of a previously convicted felon, poses for the public." *United States v. Doe*, 960 F.2d 221, 225 (1st Cir. 1992) (Breyer, Ch.J.) (citations omitted).

Moreover, Tzannos's contention that Trooper Russolillo perjuriously fabricated a confidential informant who never existed is entirely baseless. Without recounting all of the flaws

in Tzannos's analysis that have been pointed out in other briefs previously filed by the government, suffice it to say that the First Circuit instructed the district court to deny Tzannos's suppression motion, *United States v. Tzannos*, 460 F.3d 128 (1st Cir. 2006), after the First Circuit requested and reviewed an *ex parte* and *in camera* submission related to that issue.

>    II.   The Sentence That A State Court Might Have Imposed Should Not Be Considered by This Court

Tzannos's weapons and ammunition were discovered by members of the Massachusetts State Police ("MSP") when they executed a state search warrant at Tzannos's house. Although Tzannos initially was charged in state court, the state charges were dropped in favor of this federal prosecution.

Tzannos contends that if his case had proceeded to conclusion in state court and had never come to federal court, he would have avoided incarceration entirely and would have merely been sentenced to probation. He argues that this Court should consider the "federal/state sentencing disparity" and give him a federal probationary sentence. (Br. 9).

However, there are compelling reasons why this Court should not consider the sentence that Tzannos might have received in state court.

The federal Sentencing Guidelines were enacted to reduce sentencing disparities between federal courts, so that federal courts across the nation would impose similar sentences for the same crimes. The Sentencing Guidelines would be totally undermined if federal criminal defendants in different states received wildly dissimilar sentences based upon nothing more than the differences between state law and state court sentencing practices in different states.

Thus, in *United States v. Snyder*, 136 F.3d 65, 69 (1st Cir. 1998), the First Circuit held that "The legislative history makes it crystal clear that Congress's allusion to 'unwarranted sentencing disparities' reflected a concern with variations among federal courts across the nation, without reference to their state counterparts. ... [T]he guidelines seek to promote uniform sentencing among federal courts in respect to federal crimes."

Therefore, "departures aimed at alleviating federal/state sentencing disparity are flatly incompatible with [the goal of the Sentencing Guidelines]. Endeavoring to make a federal sentence more closely approximate that which a state court might impose for similar criminal activity would recreate the location-based sentencing swings that Congress sought to minimize when it opted for a guideline paradigm. *See* ... [*United States v.*] *Aguilar-Pena*, 887 F.2d [347] at 352 [(1st Cir. 1989)] (warning that departures cannot be allowed to subvert Congress's 'ardent desire to dispense with inequalities based on localized sentencing responses.')." *Snyder*, 136 F.3d at 69 (footnote and citations omitted).

The First Circuit in *Snyder* held that for a federal court to give a lighter, non-Guidelines sentence in order to alleviate federal/state sentencing disparity would "destroy" the "structural integrity" of the Sentencing Guidelines' goal of promoting uniform sentencing among federal courts, and would be "utterly inconsistent with the guidelines' theoretical underpinnings." *Id.*, 136 F.3d at 69. Thus, a departure based upon "federal/state sentencing disparity ... would contradict hopelessly the guidelines' structure and theory as well as impinge impermissibly upon the Executive Branch's discretion to prosecute defendants under federal law." *Id.* at 70 (citation omitted).

The legislative history and reasoning behind *Snyder* still apply, because *United States v. Booker*, 543 U.S. 220, 264 (2005), holds that "[t]he district courts ... must consult [the Sentencing]

Guidelines and take them into account when sentencing." *See United States v. Vazquez-Rivera*, 407 F.3d 476, 490 (1st Cir. 2005); *United States v. Figuereo*, 404 F.3d 537, 542 (1st Cir. 2005); *United States v. Serrano-Beauvaix*, 400 F.3d 50, 55 (1st Cir. 2005); *United States v. Antonakopoulos*, 399 F.3d 68, 76 (1st Cir. 2005).

The Supreme Court reiterated in *Booker* that "Congress' basic goal in passing the Sentencing Act was to move the sentencing system in the direction of increased uniformity," 543 U.S. at 253, and that "Congress enacted the sentencing statutes in major part to achieve greater uniformity in sentencing...." *Id*. at 255.

Clearly, a sentencing court would not have adequately "consulted the Sentencing Guidelines and taken them into account" within the meaning of *Booker* if it rested a sentence wholly or in part on a factor like race, sex, national origin, creed, religion, or socio-economic status that is *never* relevant in the determination of a sentence. *See* Sentencing Guidelines § 5H1.10.

Similarly, a sentencing court would not have adequately consulted the Guidelines and taken them into account under *Booker* if it based a sentence on a factor -- like federal-state sentencing disparity -- that is "flatly incompatible" with, and that "contradict[s] hopelessly," the structure and theory of the Guidelines.

In other words, since consideration of federal-state sentencing disparities was "flatly incompatible" with, and "would contradict hopelessly" the structure and theory of the mandatory, pre-*Booker* Guidelines system, it remains "flatly incompatible" with, and in hopeless contradiction of, the structure and theory of the identical Guidelines system that *Booker* has made advisory.

Consideration of federal-state sentencing disparities would effectively render the advisory Guidelines system nugatory, and as the First Circuit has recognized, *see, e.g.*, *Vazquez-Rivera*, 407 F.3d at 490, the Supreme Court plainly did not intend that result. *See Booker*, 543 U.S. at 258-59.

Citing *United States v. Wilkerson*, 411 F.3d 1, 10 n.** (1st Cir. 2005), Tzannos argues that the First Circuit "recently left open the question 'whether federal-state sentencing disparities may be considered under the post-*Booker* advisory guidelines.'" (Br. 7). However, the quoted footnote from *Wilkerson* needs to be considered in light of why it came to be included in the opinion.

The First Circuit's *Wilkerson* opinion was written by Judge Gibson of the Eighth Circuit, sitting by designation. The original slip opinion in *Wilkerson* made no mention of the First Circuit's *Snyder* decision, and suggested -- without analysis -- that sentencing courts may properly consider disparities between federal and state sentences for similar offenses under the advisory Guidelines system established by *Booker*.

The government promptly filed a petition for rehearing, stating that although the government did not object to the panel's decision to remand the *Wilkerson* case for resentencing, the slip opinion contained "a serious error" by suggesting that federal/state sentencing disparities could be considered by the district court.

The First Circuit responded by amending its opinion. After the First Circuit noted that the district court had stated that the Guidelines did not permit him to take federal/state sentencing disparities into account, the First Circuit inserted, "This statement of the district judge was in accord with our earlier decision in *United States v. Snyder*, 136 F.3d 65, 69 (1st Cir. 1998) (Selya, J.)" The

First Circuit then added the footnote: "We express no opinion at this time about whether federal-state sentencing disparities may be considered under the post-*Booker* advisory guidelines."[2]

Thus, far from suggesting that the First Circuit is likely to jettison *Snyder's* prohibition against considering federal/state sentencing disparities, the *Wilkerson* panel took the trouble to amend its opinion in order to make plain that it was not prepared to overrule *Snyder* at that time.[3]

Although the First Circuit has not had occasion to revisit this issue, other circuits have held, post-*Booker*, that federal-state sentencing disparities may not be considered.[4] For example:

- *United States v. Clark*, 434 F.3d 684, 687 (4th Cir.) ("[T]he result of according 'great weight' to the sentences that defendants would receive in the state courts in which their respective crimes were committed ... would be a sentencing regime that actually produced, rather than avoided, sentencing disparities among federal defendants, because federal defendants who engaged in the same criminal conduct would receive different sentences merely because they committed their federal crimes in different states. .... *The sole concern of section 3553(a)(6) is with sentencing disparities among federal defendants*. ... Creating sentencing disparities among federal defendants for no other reason than to eliminate the accepted disparities that inhere

---

[2] Submitted herewith as Exhibit 1 is the First Circuit's original slip opinion in *Wilkerson*. Exhibit 2 is the "Errata," in which the First Circuit amended the opinion.

[3] On remand, the district court did *not* consider federal-state sentencing disparities. *See* "Amended Judgment in a Criminal Case," Document 189, *United States v. Wilkerson*, Dkt. 00-cr-10426-MLW (December 20, 2005), at 9.

[4] Tzannos cites a few district courts in other circuits, but their opinions are not persuasive.

in the parallel federal and state systems of justice is unreasonable."), *cert. denied*, 126 S.Ct. 2054 (2006)

♦ *United States v. Wurzinger*, 467 F.3d 649, 654 (7th Cir. 2006) ("Reducing a federal prisoner's sentence to accord with that of a similarly situated state convict may decrease one sentencing disparity but simultaneously enlarges another: that between the federal convict and all similarly situated federal convicts. Because penalties vary from state to state, sentence reductions to approach state penalties similarly vary with the state in which the federal sentencing court sits, unjustifiably creating disparities among federal convicts."), *petition for cert. filed* (U.S. Feb. 22, 2007) (No. 06-9706).

♦ *United States v. Jeremiah*, 446 F.3d 805, 807-08 (8th Cir. 2006) ("[The Sentencing] 'Commission's goal of imposing uniformity upon federal sentences for similarly situated defendants would be impeded, not furthered,' if potential federal/state sentencing discrepancies were considered. ... Unwarranted sentencing disparities among federal defendants remains the only consideration under § 3553(a)(6) -- both before and after *Booker*. ... The District Court was neither required not permitted under § 3553(a)(6) to consider a potential federal/state sentencing disparity in imposing Jeremiah's sentence.")

♦ *United States v. Branson*, 463 F.3d 1110, 1112 (10th Cir. 2006) ("Federal and state authorities have concurrent jurisdiction over various offenses and may apply disparate punishments to similar conduct. Adjusting federal sentences to conform to those imposed by the states where the offenses occurred would not serve the

purposes of § 3553(a)(6), but, rather, would create disparities within the federal system, which is what § 3553(a)(6) is designed to discourage.").

Finally, although the state sentence that Tzannos might have received is not an appropriate factor for a federal sentencing court to consider at all, we note that there is nothing in the record indicating whether the unnamed state prosecutor in Tzannos's case believed that a probationary sentence was appropriate for this type of crime, or whether other factors such as a heavy caseload, limited prosecutorial resources, and/or a concern about protecting the identity of a confidential informant might have factored into such a decision.

### III. Tzannos's Conduct Merits A Prison Sentence and Fine

Tzannos points out that his prior felony was committed 39 years ago, and that he never received an evidentiary hearing on his *Franks* motion in the present case. (Br. 2-3, 9). He also argues that his "impressive" background (Br. 10), "great character" (Br. 13), "generous donation[s]" (Br. 14-15), and other characteristics demonstrate that a sentence of probation would be appropriate in this case.

Notably, however, Tzannos has provided this Court with no reason to believe that he had any lawful form of employment for the 25 years from 1979 to 2004 (when he was age 32 to 57) or since September 2006.

But, on August 28, 2003, Justice Paul F. Mahoney of the East Boston District Court, authorized a search for evidence of an illegal bookmaking operation in Tzannos's residence. In executing the search warrant at Tzannos's home, the State Police found and seized gambling records, a gaming pager, voice activated tape recorders, tapes containing recordings of bookmaking conversations, and $10,200 in cash.

In addition, when the State Police executed the search warrant on August 28, 2003 at Tzannos's house, they found a loaded Raven .25 caliber semiautomatic handgun, a New Baker double-barreled shotgun (that was sawed-down, but was 1/16 of an inch too long to qualify as a "short-barrel shotgun"), a loaded Colt .38 caliber special revolver, a loaded .38 caliber Special Smith & Wesson revolver (which was not charged in this case because the government could not prove it had traveled interstate), a blowgun with needles, a pair of brass knuckles, three switch blades, a box containing fifty (50) .38 caliber bullets, and a bag containing various rounds of ammunition.

None of the weapons was registered to Tzannos, and he initially told the State Police that there were no weapons in his house.

Tzannos's felon-in-possession crime merits a sentence within the applicable Guidelines range. He knowingly and unlawfully possessed a series of dangerous firearms and ammunition; hid the weapons between the box spring and mattress of his bed, in a closet, and in his desk drawers; and lied when asked at the outset of the search whether he had any weapons in his house.

This was not a minor or inadvertent infraction, and Tzannos has offered no excuse for his conduct. To the contrary, he has repeatedly -- even in his sentencing memorandum -- impugned without justification the integrity of a state trooper, and Tzannos somehow believes that it is unfair that he is being prosecuted federally for a serious federal crime.

A prison sentence, fine, and period of supervised release within the applicable Guidelines range would reflect the seriousness of Tzannos's offense, promote respect for the law, provide just punishment, afford adequate deterrence, and hopefully protect the public from further crimes by this defendant. *See* 18 U.S.C. § 3553.

## Conclusion

Tzannos knowingly and willfully committed the crime of felon-in-possession, and he should receive a sentence within the Guidelines Range of 12 to 18 months. The government believes that a sentence of (a) incarceration for 15 months, (b) a fine of $15,000, (c) supervised release for three years, and (d) a mandatory special assessment of $100 would be appropriate.

                                          Respectfully submitted,

                                          MICHAEL J. SULLIVAN
                                          United States Attorney

By:    /s/ Michael L. Tabak
           MICHAEL L. TABAK
           Assistant U.S. Attorney

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered parties.

                                          /s/ Michael L. Tabak
                                          Michael L. Tabak
                                          Assistant United States Attorney

Date: April 17, 2007